**BUCKS COUNTY CABLE TV, INC.,**
Petitioner,

v.

**UNITED STATES of America and Federal Communications Commission,**
Respondents,

**U. S. Communication Corp., Intervenor.**

**BUCKS COUNTY CABLE TV, INC.**

v.

**UNITED STATES of America and the Federal Communications Commission and Robert T. Bartley, Kenneth A. Cox, Rosel H. Hyde, Nicholas Johnson, H. Rex Lee, Robert E. Lee, James J. Wadsworth, Appellants.**

Nos. 17743–17745, 18037.

United States Court of Appeals,
Third Circuit.

Argued April 3, 1970.

Decided June 4, 1970.

John H. Conlin, Federal Communications Commission, Richard W. McLaren, Asst. Atty. Gen., Howard E. Shapiro, Robert B. Nicholson, Attys., Department of Justice, Henry Geller, General Counsel, Katrina Renouf, Atty., Federal Communications Commission, Washington, D.

C., for respondents in No. 17743/5 and appellants in No. 18037.

Charles A. Miller, William Malone, Covington & Burling, Washington, D. C., for intervenor in Nos. 17743/5.

Alan J. Davis, Howard Gittis, Wolf, Block, Schorr & Solis-Cohen, Philadelphia, Pa., for petitioners in Nos. 17743/5 and appellee in No. 18037.

Before HASTIE, Chief Judge, and MARIS and ADAMS, Circuit Judges.

## OPINION OF THE COURT

ADAMS, Circuit Judge.

This case presents the question whether the regulatory arrangement promulgated by the Federal Communications Commission (FCC) to control the growth of community antenna television (CATV), has been applied to petitioner-appellee in a manner depriving it of due process. Principally at issue is the application of the FCC's automatic stay provision to the proposed CATV operation of Bucks County Cable TV, Inc. (Bucks).

A community antenna or cable television system picks television signals off the air with a specialized receiving antenna, amplifies them, and transmits them through coaxial cable to the television receiving sets of home viewers who pay for the service.

The main cable television growth has been in areas of limited television service where off-the-air signals are available from only one or two stations. In these areas, CATV's main attraction has been its ability to offer subscribers a full complement of network programming. More recently CATV systems have spread into the nation's larger cities which already receive the three major networks. Aside from improved reception, CATV systems are able to supply subscribers in the larger cities with an even greater selection of programs by importing signals of non-network stations from other communities.

On April 22, 1965, the FCC released a Notice of Inquiry and Notice of Proposed Rule Making, 1 F.C.C. 2d 453, proposing to regulate all CATV operations. In the notice, the FCC expressed particular concern with cable television's recent movement into the nation's major television markets. The FCC and Congress had previously decided that the development of UHF broadcast stations was essential for the achievement of adequate local interest programming within the major markets. The FCC was primarily concerned in the notice with the effect that the importation of signals from outside communities would have on the ability of UHF stations to develop as effective outlets for local self-expression.

In 1965, subsequent to the release of the Notice of Proposed Rule Making, Bucks received municipal franchises to establish and operate CATV systems in five Bucks County, Pennsylvania communities. Bucks planned to carry to its subscribers the signals of all the Philadelphia stations and to import the signals of four New York City non-network stations. Bucks considered the carriage of New York signals necessary to attract a sufficient number of subscribers to make its operation profitable.

On March 8, 1966, in its Second Report and Order, 2 F.C.C.2d 725, the FCC announced regulations for cable television operations, 42 C.F.R. 74.1100–74.1109. The Commission found that the importation of signals from other communities into the major markets posed a serious threat to the development of UHF broadcasting within the major markets. CATV systems were, therefore, restricted from importing into any of the nation's 100 largest television markets the signals of outside television stations at least where the signals of those stations would be extended beyond their Grade B contours.[1] 47 C.F.R. 74.1107(a).

In addition, the FCC adopted a procedure whereby it could resolve objections

---

1. The Grade B contour of a television station is the imaginary line within which a good picture may be expected 90% of the time at the best 50% of the locations. See 47 C.F.R. § 73.683.

to any proposed CATV operation before it commenced service. It provided that a CATV system was required to give notice to all television broadcast stations within whose Grade B contours it planned to operate, at least thirty days prior to commencing new service. 47 C.F.R. 74.1105(a). If within thirty days after such notice a station objected to an aspect of the proposed service, the challenged portion of that service would be stayed pending consideration by the FCC. 47 C.F.R. 74.1105(c). The rules also provide that in such a case "the Commission will expedite its consideration and promptly issue a ruling * * * ". 47 C.F.R. 74.1109(f).

The five communities in which Bucks was franchised to establish CATV systems are all part of the Philadelphia television market, being within the prime reception area or Grade A contour of the Philadelphia broadcast stations. Of these five communities, Falls Township, less than ten miles from Philadelphia, is also within the fringes of the Grade B contours of the New York City independent stations. Bucks decided to construct a CATV system only in Falls Township. It contends that its decision was based on the belief that the carriage of New York Grade B signals into Falls Township was authorized by the existing rules.

In September, 1966, six months after the release of the Second Report and Order, Bucks began construction in Falls Township. Over approximately the next two years, it invested $267,000 in out-of-pocket expenditures and committed itself to $150,000 of long term expenditures. On May 17, 1968, in compliance with the rules, Bucks gave notice to area stations of its intention to commence service. Two Philadelphia UHF stations filed timely petitions objecting to that part of Bucks' proposed service which contemplated carriage of New York City signals. The objections put into effect the automatic stay provision of section 74.1105(c) which prohibited Bucks from carrying the challenged signals pending consideration by the FCC. The parties filed extensive pleadings and on August 7, 1968, the matter became ripe for consideration. On October 23, 1968, with no action having been taken by the FCC, Bucks filed a petition for temporary relief requesting permission to commence carriage of the New York signals pending the FCC's determination of the UHF stations' objections.

On December 13, 1968, the FCC released a Notice of Proposed Rule Making and Notice of Inquiry, 15 F.C.C.2d 417, in which it proposed revisions of its CATV rules. The new rules were intended "to substitute a definitive policy for the evidentiary hearing procedure" adopted in the Second Report and Order. The FCC dealt directly with the situation in which the Grade B contour of a station in one market overlaps a portion of another market. Under the new standards a CATV system would be prohibited from importing signals from one major market into a community within 35 miles of the center of another major market without the consent of the originating broadcast station. Since Falls Township is less than ten miles from Philadelphia, and the New York stations have thus far refused retransmission consent, the new rules would effectively bar Bucks from importing the New York City signals.

Pending final action on the proposed rule changes, the FCC suspended all action on CATV systems awaiting its approval and announced that CATV operations would be authorized to commence service only if "entirely consistent with the proposed rules." 15 F.C.C.2d 417 at para. 51 and 52. Only CATV systems lawfully in operation prior to December 20, 1968, the date of publication of the Notice in the Federal Register, would not be required to meet the standards of the new rules.

Hoping to avoid the effect of the proposed rules, Bucks began operation, including the carriage of New York signals, on December 19, 1968. Since the FCC had not ruled on the objections of the UHF stations, Bucks' action was in clear violation of the stay provision of section 74.1105(c).

On December 24, 1968, Bucks brought an action for declaratory judgment in the District Court for the Eastern District of Pennsylvania, alleging that section 74.1105(c) was unconstitutional, or that, even if reasonable on its face, such section had been improperly and prejudicially applied to Bucks.

During the pendency of the District Court action, the FCC for the first time, on January 22, 1969, issued an order regarding Bucks' case. The Commission denied Bucks' petition for temporary relief and consolidated the UHF petitions for hearing with other pending CATV proposals to serve Philadelphia. However, the FCC expressly noted the applicability of the December 13th Notice under which all CATV hearings were being held in abeyance during the pendency of the rulemaking proceedings.

On March 28, 1969, the District Court ruled in Bucks' favor declaring that section 74.1105(c) had been unconstitutionally applied to Bucks. The Court also granted a preliminary injunction against prosecution of Bucks for commencing carriage of the New York signals.

Initially, the FCC contends that the District Court lacked jurisdiction over the subject matter of Bucks' claim. It bases this contention upon 28 U.S.C. § 2342 which provides courts of appeals with exclusive jurisdiction to review "all final orders" of the FCC. The District Court found that, although Bucks was aggrieved by "final agency action," see 5 U.S.C. § 704, there was no "final order" of the FCC which would allow Bucks to seek direct review in a court of appeals. However, while the action was still pending before the District Court, Bucks, in order to preserve its rights on the merits, filed three petitions for review directly in this court. These petitions duplicate the relief requested in the District Court. In addition no factual issues are presented for resolution. Thus, whether on appeal from the District Court or on direct review from a "final order" of the FCC, this Court has jurisdiction in the present case. We, therefore, find it unnecessary to determine whether the District Court properly asserted jurisdiction.

In order to avoid the effect of the proposed rules, Bucks directs its attack at section 74.1105(c) of the FCC regulations by which its operation was stayed upon the petition of two objecting UHF stations. It attempts to analogize the stay provision of that regulation to a normal judicial cease and desist order. Bucks argues that its proposed carriage of New York Grade B signals to Falls Township was permitted by the then existing FCC rules and that the automatic stay provision, allowing broadcasters to "enjoin" its operation upon the mere filing of objections without any FCC consideration, is unconstitutional. Bucks further contends that, in any case, the FCC's long delay in considering the UHF stations' objections, which were preventing its proper operation, was unconstitutional.

■ Section 74.1105(c) cannot be interpreted as a mere indiscriminate delegation of injunctive power to private parties. That section is a vital part of the FCC's total regulatory concept, adopted in a comprehensive rule-making proceeding. It is important to recognize in this regard that cable television is a dynamic and growing industry presenting complex problems for FCC regulation. Additionally, the Commission has repeatedly recognized the impracticability of withdrawing CATV service from subscribers once it has become established. Second Report, supra, 2 F.C.C.2d at 782. The FCC determined that a procedure was necessary by which it could review proposed CATV service before that service became entrenched. Rather than prohibit all CATV operations pending consideration, the FCC allowed those operations not involving the extension of signals beyond their Grade B contours to proceed unmolested unless there was an objection. But where important issues of impact on broadcast services were raised, by objection or otherwise, the FCC required that such issues be considered before the CATV system commenced operations.

■ However, Bucks contends that the automatic stay, even if valid when first imposed, could not be continued in effect without prompt agency consideration, and became invalid and without force sometime before December 19, 1968, because of the FCC's delay in considering the objections of the UHF stations. We must re-emphasize in this regard that section 74.1105(c) is not a judicial cease and desist order, but is rather an integral part of the FCC's regulatory scheme designed to provide for prior agency consideration of important problems posed by CATV service. In considering these complex public-interest problems, the FCC was not bound by the same strict time limitation which binds courts in the consideration of temporary restraining orders.[2] The limitations on temporary restraining orders reflect the fact that they are normally sought in situations where one has already begun operation, after substantial investment, under a prima facie right. In contrast, the FCC's automatic stay is not applied where legal operation has commenced and does not prevent the exercise of any presumptive right. It is designed to facilitate a prior determination whether a proposed operation should be sanctioned in the public interest where objectors raise that question. Furthermore, the regulations contemplate that the stay will be applied before substantial investments have been made. Although Bucks did invest money before the stay went into ef-

fect here, as noted below Bucks could easily have avoided this result by disclosing its intentions at an earlier date before any investment was made. However, while the automatic stay is not restricted to the same extent as judicial restraining orders, the FCC was constrained by its own rules to "expedite its consideration and promptly issue a ruling." 47 C.F.R. 74.1109(f).

The objections of the UHF stations became ready for consideration on August 7, 1968. The FCC issued a ruling on January 22, 1969, in which it decided that the stay was proper and should be continued. This five month period before the FCC acted with regard to Bucks' individual system does not appear unreasonable in view of the large number of similar matters then pending before the FCC for consideration.[3] Furthermore, over a month before the January decision, in the December 13th Notice, the FCC specifically provided that CATV systems like Bucks, whose commencement of service had been stayed by section 74.1105(c), were continued stayed "pending the outcome of this proceeding." 15 F.C.C.2d 417 at para. 52.

In addition, the FCC had previously developed a city-by-city approach to CATV proposals and had repeatedly refused permission to CATV systems to import even Grade B signals from other communities into a major market pending a market-wide hearing.[4] On March 13,

2. Rule 65(b) of the Federal Rules of Civil Procedure provides that a temporary restraining order issued by a district court may remain in effect for only ten days unless renewed.

3. The Commission's Annual Report for 1968 contains the following overall statistics with respect to CATV proceedings before the agency during the 1968 fiscal year. "A total 362 requests for authority to bring distant TV signals into the top-100 markets have been filed—86 during the past fiscal year. One hundred fifty-four have been disposed of and a backlog of 208 remains. Under Section 74.1109 (requests for special relief or waiver of the carriage and program ex-

clusivity rules), 235 petitions were filed and 163 acted upon during the fiscal year. Under Section 76.1105 (notification prior to commencement of service), 282 notifications were filed. Five hundred eight microwave applications to serve CATVs were filed: 309 in the Common Carrier Service, 48 in Safety and Special Radio Services, and 62 in the Community Antenna Relay Service (CARS). A total of 838 applications was acted upon during the fiscal year." *34th Annual Report of the Federal Communications Commission* (1968).

4. *See, e. g.,* Vision Cable Co., 10 F.C.C.2d 954 (1967), designated, 14 F.C.C.2d 654 (1968), Buckeye Cablevision, Inc., 10

1968, two months before Bucks gave notice of its intended service, the FCC had considered similar CATV proposals to serve Philadelphia and had established a firm policy for CATV activity in that market. Carriage of New York City signals into any community located within forty miles of Philadelphia was stayed, and all such proposals were consolidated for a marketwide hearing. Delaware County Cable Television Co., 12 F.C.C. 2d 529, 534 (1968). Thus, Bucks was aware that, consistent with FCC policy for the Philadelphia market, its challenged carriage of New York signals would be further stayed pending an area-wide hearing.

 Even assuming the FCC's delay in actually issuing this expected order was in technical violation of its rules, that delay itself does not entitle Bucks to operate. The proper judicial response to the situation in which an agency has delayed prompt consideration would be to order that such consideration be immediately given. However, in both the December 13th Notice and in the January 22nd Order, the FCC gave consideration, even if not expedited, to the propriety of continuing Bucks under stay. In waiting until those dates to take the expected action, the FCC did not provide Bucks with a legal excuse for commencing service in clear violation of announced FCC policy.

In support of its claimed relief, Bucks creates the impression that the carriage of New York Grade B signals into Falls Township was authorized by FCC policy announced in the Second Report and Order, that it constructed its CATV system in reliance on that policy, and was caught, due to the FCC's delay, under changed standards which prevented its operation without even the opportunity for a hearing to which it was entitled under the prior rules. We cannot agree.

The Second Report and Order rather than authorizing the carriage of New York signals into Falls Township, raised serious doubts whether such carriage would be permitted.

The primary concern of the Second Report and Order was with the effect that carriage of signals from the major market into another would have on the development of local-interest UHF broadcasting in the latter market. The FCC found that the imported signals would compete directly and unfairly with local UHF stations for the already limited audience interested in non-network programming. Repeated reference was made in the Report to the Philadelphia television market where the FCC feared that importation of the New York City signals might completely destroy the UHF stations with a resulting loss of local-service programming. 2 F.C.C.2d at 772–75.

The rules adopted in the Second Report and Order to protect UHF broadcasting cannot be understood as restricting only carriage of signals beyond their Grade B contours and, thereby, authorizing all other CATV service. The FCC not only specifically restricted carriage of signals beyond their Grade B contours, but also adopted a procedure whereby it could review other proposed CATV service. Indeed, the FCC specifically noted in this regard that proposals, such as Bucks', to carry Grade B signals from one major market into another, could have the same feared effect on UHF broadcasting. Second Report, supra, 2 F.C.C.2d at 786 n. 69.

On July 20, 1966, some two months before Bucks began construction in Falls Township, the FCC released its first decision under the major market policy of the Second Report and Order. In Midwest Television, Inc., supra, 4 F.C.C.2d at 621–22, the FCC stayed the importation of Los Angeles signals into San Diego even though the CATV systems in San Diego were within the Grade B contours of the Los Angeles stations. The FCC made emphatically clear in *Midwest*

F.C.C.2d 745 (1967), National Cable Co., Inc., 10 F.C.C.2d 613 (1967), Fetzer Cable Vision, 6 F.C.C.2d 845 (1967), Mid-

west Television, Inc., 4 F.C.C.2d 612 (1966).

that it would be a misconception of FCC policy for a CATV system to believe that the Second Report and Order authorized the carriage of even Grade B signals from one major market into another.[5]

 Thus, Bucks' decision to invest funds for the construction of a CATV system in Falls Township was made with full awareness of the substantial risk that if objected to, its proposed carriage of New York City signals would not be permitted. It deserves mention in this regard that Bucks could have avoided risking any funds by simply giving notice of its proposed service prior to beginning construction. If no objection was lodged within thirty days, it could have proceeded unimpeded. However, Bucks chose to wait to give notice until its construction was almost complete in May, 1968. During this period of approximately two years the FCC repeatedly stayed CATV systems proposing to carry Grade B signals from one major market into another. Indeed, on March 13, 1968, the FCC stayed other CATV proposals to carry New York City Grade B signals into the Philadelphia market, stating that

"we can find little reason for permitting carriage of some New York signals but not permitting carriage of others merely on the happenstance of the location of the predicted contour." Delaware County Cable Television Co., supra, 12 F.C.C. 2d at 534 (1968).

 Equally without merit is Buck's contention that the Commission's delay deprived Bucks of a hearing under the prior rules. Bucks possessed no vested right in such a hearing.

The Second Report and Order is most clearly understood as a temporary measure designed to gain experience for further action in the complex area of cable television regulation. The hearing process was intended, not to establish vested standards for the resolution of private disputes, but primarily as a tool by which the Commission could better inform itself of the impact of CATV operations within the major markets. The FCC made quite clear that "as we gain more knowledge in this important area, particularly from the hearings being held, we shall revise or terminate the procedure, as the experi-

---

5. The Commission stated:

"Some of the respondents have alleged that since their systems operate within the predicated or measured grade B contours of the Los Angeles stations carried on their systems, the provisions of * * * the second report * * * which relate generally to extension of beyond grade B signals, do not apply to their systems and that they may, therefore, continue to expand without hindrance. This contention, however, misconceives the main thrust of our major market policy. The Commission's primary concern with respect to CATV operations in the major markets importing distant television signals was whether such operation 'may be of such nature or significance as to have an adverse economic impact upon the establishment or maintenance of UHF stations or to require these stations to face substantial competition of a patently unfair nature' (second report, par. 139). We defined distant signals as those signals extended or received beyond the grade B contours of those stations. While this standard will gen-

erally encompass our main area of concern (i. e., the importation of signals not allocated to the area), it is by no means a fixed and immutable standard to which we will blindly adhere. As we pointed out in the second report, CATV activity which does not involve extension of a signal beyond the grade B contour may continue, ' * * * with possibly only the rarest exception * * ' (second report, par. 151). This exception involves a situation where, for instance, two major markets fall within one another's grade B contours, and the importation of signals of the stations in one market into the other would equalize the quality of the distant signals, possibly change the viewing habits of the latter community, and affect the development of independent UHF stations there. [Second Report, 2 F.C.C. 2d at 786 n. 69]. Assuming, arguendo, as respondents contend, that their systems are within the predicted or measured grade B contours of the Los Angeles stations, this is exactly the situation presented here."

ence indicates." Second Report, supra, 2 F.C.C.2d at 786.

In Midwest Television, Inc., 13 F.C.C. 2d 478, 505 (1968), the only major market hearing completed under the procedures of the Second Report, the FCC recognized the inadequacy of such individual hearings and the need "for the formulation of overall policy" to govern CATV operations. Accordingly, the December 13th Notice was designed to achieve the "far-ranging, overall view [that] is necessary if the Commission is to come to grips with this dynamic field * * *" Notice of Proposed Rule Making, supra, 15 F.C.C.2d 417. The proposed rules deal directly and comprehensively with the situation in which the Grade B contours of two major markets overlap—the exact problem presented by Bucks' intended operation. The FCC is presently receiving comments and considering suggestions with regard to its recommended standards. There is no basis for the contention that the FCC should be bound to afford Bucks an individual hearing rather than take a comprehensive approach toward the issue presented as it has found necessary. See, Friendly, The Federal Administrative Agencies: The Need for Better Definition of Standards, 75 Harvard L. Rev. 863 (1962).

It is important to note that the delay of which Bucks complains did not prove prejudicial because of the mere passage of time or the occurrence of some independent circumstance. The circumstance which Bucks seeks to avoid in the present case is an FCC proposal developed after careful consideration of the issues and determined to be in the public interest. The FCC determined that CATV proposals such as Bucks', which intended to import distant signals into a major market, would compete unfairly with the local UHF stations. The UHF station is forced to pay for its programming while the CATV system, without any payment, brings the same programming into the community by simply importing distant signals. In order to eliminate the unfair competitive impact,

the FCC required a CATV system intending to import distant signals, to bargain with the originating station for retransmission consent. Bucks has shown no equity in the prior rules which would allow it to avoid this public interest requirement.

The judgment of the Court below will be reversed and the petitions for review of the order of the Federal Communications Commission will be denied.