

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-19-1994

# State of NJ v. Long Island Power Co.

Precedential or Non-Precedential:

Docket 93-5613

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"State of NJ v. Long Island Power Co." (1994). *1994 Decisions*. Paper 84.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/84

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 93-5613

———————

STATE OF NEW JERSEY,
DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY;
JEANNE M. FOX, in her official capacity as Acting Commissioner
of the Department of Environmental Protection and Energy

v.

LONG ISLAND POWER AUTHORITY;
THOMAS DE JESU, in his official capacity as
Executive Director of the Long Island Power Authority;
UNITED STATES NUCLEAR REGULATORY COMMISSION;
U.S. COAST GUARD, within the
United States Department of Transportation;
PHILADELPHIA ELECTRIC COMPANY

New Jersey Department of Environmental
Protection and Energy and Jeanne M. Fox,
Commissioner of the New Jersey Department
of Environmental Protection and Energy,
in her official capacity,
                    Appellants

———————————————————————————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil Action No. 93-cv-04269)

———————————

Argued December 1, 1993

Before:  BECKER and SCIRICA, Circuit Judges
         and POLLAK, District Judge*

(Filed July 19, 1994)

*The Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

THOMAS A. KOWALCZYK, ESQUIRE (Argued)
JOHN M. VAN DALEN, ESQUIRE
Office of Attorney General of New Jersey
Department of Law & Public Safety
Richard J. Hughes Justice Complex
Trenton, New Jersey 08625

   Attorneys for Appellants


BARRY M. HARTMAN, ESQUIRE (Argued)
LAWRENCE C. LANPHER, ESQUIRE
Kirkpatrick & Lockhart
1800 M Street, N.W., South Lobby
Washington, D.C. 20036-5891

PAUL G. SHAPIRO, ESQUIRE
Cohen, Shapiro, Polisher, Shiekman & Cohen
1009 Lenox Drive
Princeton Pike Corporate Center, Building Four
Lawrenceville, New Jersey 08648

RICHARD P. BONNIFIELD, ESQUIRE
Long Island Power Authority
200 Garden City Plaza, Suite 201
Garden City, New York 11530

   Attorneys for Appellees, Long Island Power Authority
   and Thomas De Jesu, in his official capacity as
   Executive Director of the Long Island Power Authority


KATHERINE W. HAZARD, ESQUIRE (Argued)
United States Department of Justice
P.O. Box 23985
L'Enfant Plaza Station
Washington, D.C. 20026

   Attorney for Appellees, United States Nuclear Regulatory
   Commission and U.S. Coast Guard, within the United States
   Department of Transportation


ROBERT M. RADER, ESQUIRE (Argued)
Winston & Strawn
1400 L Street, N.W.
Washington, D.C. 20005

   Attorney for Appellee, Philadelphia Electric Company

---

OPINION OF THE COURT

---

SCIRICA, <u>Circuit</u> <u>Judge</u>.

The New Jersey Department of Environmental Protection
and Energy (NJDEPE) appeals the denial of its application to
enjoin shipment of partially irradiated reactor fuel by barge
through New Jersey coastal waters. NJDEPE claims the shipment
violates the National Environmental Policy Act (NEPA), 42 U.S.C.
§§ 4321-4347 (1988), because neither the Nuclear Regulatory
Commission (NRC) nor the United States Coast Guard conducted an
environmental assessment of the method and route of
transportation. NJDEPE also claims certain licenses were
improperly granted to the Philadelphia Electric Company (PECo)
and the Long Island Power Authority (LIPA) by the NRC and the
Coast Guard in violation of the Coastal Zone Management Act
(CZMA), 16 U.S.C. §§ 1451-1464 (1988 and Supp. IV 1992), because
neither PECo nor LIPA demonstrated its actions would be
consistent with state coastal management laws.

We hold the district court properly dismissed NJDEPE's
NEPA claim against the NRC for want of jurisdiction, and properly
granted summary judgment on NJDEPE's CZMA claim in favor of the
Coast Guard. We also rule on three claims the district court did
not address. We will instruct the district court to grant
summary judgment for the Coast Guard on NJDEPE's NEPA claim
against it, dismiss the CZMA claim against the NRC for want of

5

jurisdiction, and dismiss the CZMA claim against LIPA and PECo for failure to state a claim.

## I.

### A.  Events leading to fuel shipment

The Shoreham Nuclear Power Station in Wading River, New York was licensed by the NRC in 1989 for full power operation but was never put into commercial operation.  LIPA, a corporate municipal instrumentality and political subdivision of New York State, bought Shoreham from the original owner, the Long Island Lighting Company, and in 1992 began the process of decommissioning the plant by dismantling and removing or decontaminating its various components.

By February, 1993, the only remaining step in decommissioning the plant was disposal of its fuel, 560 bundles of uranium-235, containing an estimated radioactivity of 176,000 Curies.[0]  On March 1, 1993, LIPA entered into an agreement with PECo and General Electric Co., under which PECo would accept delivery of Shoreham's nuclear fuel and General Electric would manage the project.  PECo intended to use the almost new nuclear fuel in its Limerick Generating Plant near Pottstown, Pennsylvania.  Under the agreement, LIPA was responsible for transporting the fuel.

---

[0]Uranium becomes irradiated as it is used for fuel.  Because the Shoreham fuel was only used for two days of testing, its level of radioactivity is relatively low.  LIPA states that 176,000 Curies is one-one hundredth of the radioactivity of fully irradiated fuel.

6

On March 8, 1993, PECo applied to the NRC for an amendment to its operating license to allow it to receive the fuel. On March 31, the NRC published a notice of a proposed finding that the license amendment involved no significant environmental hazards under NEPA, 58 Fed. Reg. 16851, 16867-68 (1993), and that transport would be by rail. Id. at 16867. On May 18, pursuant to its regulations, the NRC published an Environmental Assessment of the proposed license amendment, along with a "Finding of No Significant Impact" (FONSI), which indicated that no Environmental Impact Statement was required. 58 Fed. Reg. 29010-11 (1993); see 10 C.F.R. §§ 51.21, 51.25[0]; 42 U.S.C. § 4332(2)(C) (1988). The FONSI did not discuss the method or route of transportation of the fuel, but included a finding that the impact from transporting the nuclear fuel would be minimal, based on application of Table S-4, 10 C.F.R. § 51.52. The NRC issued the amendment June 23, 1993.

The parties disagree about when NJDEPE learned of LIPA's plans to ship by barge. NJDEPE states that at about the time the amendment was issued, LIPA informed NJDEPE that it was considering shipping the fuel by barge along New Jersey's coast. LIPA and PECo claim they had discussed barge shipment with NJDEPE at a number of meetings in May and June. In any event, NJDEPE asserts that in July it expressed objections to barge transport but after receiving no response from PECo or LIPA assumed that the barge shipment plan had been delayed or abandoned, until an

---

[0]All C.F.R. references are to the 1993 edition of the Code of Federal Regulations unless otherwise indicated.

Assistant Commissioner of NJDEPE read in a newspaper in mid-August that LIPA and PECo still intended to pursue the plan. NJDEPE also acknowledges receipt on August 9 from LIPA of an application for a state permit, a "Certificate of Handling," that indicated the plan to transport the fuel by barge.[0]

On July 7, LIPA submitted a proposed "Operations Plan" to the Coast Guard's Captain of the Port of Long Island Sound describing the route, equipment, safety and emergency procedures of the barge shipment.[0] In a July 27 letter, the Captain of the Port stated that final approval was contingent on structural inspections of the barges, and gave directions for reporting positions and emergencies en route. NJDEPE states it did not see a copy of LIPA's plan until September 3.

LIPA planned shipment in specialized casks approved by the NRC for shipment of radioactive materials. Each cask weighs 130,000 pounds, and holds up to 17 fuel assemblies. The casks' manufacturer, non-party Pacific Nuclear Systems, Inc., asked the NRC to approve modifications in the support structure and packing of the casks to fit the Shoreham fuel assemblies. On May 11 and August 19, the NRC issued "Certificate[s] of Compliance for

---

[0]The Certificate of Handling, required by New Jersey regulation before transport of radioactive materials, 7 N.J.A.C. § 28-12, is a separate requirement from federal "Consistency Certification" under the CZMA. Although LIPA was never granted the Certificate of Handling, NJDEPE stated at oral argument that LIPA had filed an action in federal district court that resulted in its being freed from the requirement.

[0]Captains of the Port are Coast Guard officers charged with enforcing safety, security, and environmental regulations in their respective areas. 33 C.F.R. § 1.01-30(a).

Radioactive Materials Packages" to Pacific Nuclear Systems, approving the alterations. The cask is designed to contain fully irradiated fuel, which would be more than 100 times as radioactive as the Shoreham fuel.[0]

On September 8, NJDEPE notified the Coast Guard by letter, with a copy to LIPA, that the CZMA, 16 U.S.C. §1456(c)(3)(A), required LIPA to submit a "Consistency Certification" showing compliance with state coastal management law. On September 15, NJDEPE sent a similar letter to the National Oceanic and Atmospheric Administration (NOAA).[0] On October 1, NOAA replied that no such submission was required. LIPA refused to refrain from shipping until it had submitted the requested certification.

Barge shipments commenced on September 24, 1993, with each barge carrying a single cask. A total of 33 shipments was planned. The barges left Long Island, travelled south through the Atlantic Ocean, at points within 15 miles of the New Jersey Coast, went around Cape May through New Jersey waters and up the

---

[0]The cask, called the "IF-300," is authorized to contain fuel that has experienced reactor burnup of 35,000 megawatt days per metric ton of uranium, while the Shoreham fuel has experienced reactor burnup of only 87 megawatt days per ton. Similarly, each cask is authorized for fuel with a total decay heat of 11,720 watts, while the fuel in each shipment will have a decay heat of only 34 watts.

[0]The National Oceanic and Atmospheric Administration (an administration under the Commerce Department) promulgates regulations implementing the consistency provisions of the CZMA. See 15 C.F.R. Part 930. The Assistant Administrator for Coastal Zone Management of NOAA rules on requests such as NJDEPE's. Id. § 930.54.

Delaware River to dock at Eddystone, Pennsylvania. The fuel was then moved by rail to PECo's Limerick plant.

### B. Litigation

On September 21, 1993, NJDEPE filed suit against the NRC, the Coast Guard, LIPA, and PECo, raising three counts.

Count I complained the NRC and the Coast Guard had violated NEPA by not preparing adequate "Environmental Assessments" when they approved the fuel shipment from LIPA to PECo because NEPA, 42 U.S.C. § 4332(2)(C), and an NRC regulation, 10 C.F.R. § 51.30, required assessment of the risks of and alternatives to the proposed method and route of transportation. Lacking this analysis, the Environmental Assessment of PECo's license amendment was "fatally flawed." Verified Complaint at 19, Joint Appendix (J.A.) at 24.

Count II claimed the Atomic Energy Act of 1954, 42 U.S.C. §§ 2011-2282 (1988 & Supp. IV 1992), and an NRC regulation, 10 C.F.R. § 70.3, required LIPA to obtain an amendment to its license for its nuclear fuel or to its Decommissioning Plan before shipping the fuel.

Count III referred to the CZMA's requirement that applicants for certain federal licenses whose activity would affect a state's coastal zone submit certifications of consistency with the state's approved Coastal Zone Management program. 16 U.S.C. § 1456(c)(3)(A). NJDEPE claimed that Coast Guard approval of LIPA's transport plan and NRC approval of PECo's license amendment and of LIPA's transfer plans constituted

10

such licenses, but lacked the required consistency certifications.

NJDEPE requested a temporary restraining order and a preliminary injunction against shipment until an adequate Environmental Assessment was done. LIPA claimed delay in decommissioning would cost $2-3 million per month in carrying costs and additional expenses for disruption of contractors' schedules. On September 22 the district court denied the motion for a temporary restraining order. On September 24 we denied a motion for an injunction pending appeal, and the same day Circuit Justice Souter denied a motion to stay our order.

On October 12, 1993, the district court ruled on NJDEPE's claims. Reading Count I as essentially a challenge to two final orders of the NRC -- the PECo license amendment and Pacific Nuclear System's Certificate of Compliance for its containers for radioactive materials -- the court dismissed the claim for want of jurisdiction, holding that under the Hobbs Act, 28 U.S.C. § 2342 (1988 & Supp. IV 1992), the court of appeals has exclusive jurisdiction of challenges to final orders of the NRC.

Count II was withdrawn by consent of the parties.

With respect to Count III, the court observed that the CZMA required a consistency certification only from an applicant for "a required Federal license or permit." 16 U.S.C. §1456(c)(3)(A). Citing a finding by the National Oceanic and Atmospheric Administration that LIPA's submission of its transport plan was not an application for a required federal license or permit, and that the Coast Guard had not in fact

11

issued a federal license or permit, the court found the CZMA requirements inapplicable.

NJDEPE appealed the orders on Counts I and III.[0] We accelerated the appeal and on December 1 heard oral argument. Because the parties expressed an urgent need for a quick resolution we issued an oral opinion from the bench, noting that a written opinion would follow. We held that all of NJDEPE's claims failed, and briefly set forth our reasons. We now write to explain our holding.[0]

## II.

NJDEPE invoked the subject matter jurisdiction of the district court under 28 U.S.C. §§ 1331 (1988) (federal question), 1361 (1988) (mandamus), 1337 (1988) (actions arising under acts of Congress regulating commerce), and 5 U.S.C. § 701-06 (1988) (Administrative Procedure Act). We have jurisdiction of the district court's dismissal and grant of summary judgment under 28 U.S.C. § 1291 (1988).

We have plenary review over whether the district court had subject matter jurisdiction. "`[W]e accept as true the facts alleged in the complaint and all reasonable inferences that can

---

[0]NJDEPE states in its brief that it agreed to dismissal of Count II's Atomic Energy Act claims only with respect to LIPA, but not to other parties. Because NJDEPE did not press any of those claims in its brief or oral argument, we regard Count II as properly dismissed and not before us on appeal.
[0]In our oral opinion, we stated alternative grounds for several holdings. Seeking to rule on grounds as narrow as possible, we have determined we need not reach some of the issues discussed in the oral opinion. Particularly, we do not decide whether consistency review of the Coast Guard action would conform to the overarching mandate of the CZMA, nor against what kinds of impacts or harms NEPA or the CZMA is supposed to protect.

12

be drawn from them.'" Boarhead Corp. v. Erickson, 923 F.2d 1011, 1016 (3d Cir. 1991) (citation omitted).

We have plenary review over the district court's grant of summary judgment. Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 76 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991). "[T]he appellate court is required to apply the same test the district court should have utilized initially. Inferences to be drawn from the underlying facts contained in the evidential sources submitted to the trial court must be viewed in the light most favorable to the party opposing the motion." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

**III.**

In its NEPA claims, NJDEPE contends that the NRC and the Coast Guard, through granting various licenses and permits, allowed transport of radioactive material without adequate environmental impact assessment.

**A. The National Environmental Policy Act**

NEPA aims to encourage "harmony between man and his environment," to "prevent or eliminate damage to the environment" and to "stimulate [human] health and welfare." 42 U.S.C. § 4321. To this end, it structures governmental decisionmaking in two respects:

> "First, it places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action. Second, it ensures that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process."

13

<u>Limerick Ecology Action v. NRC</u>, 869 F.2d 719, 725 (3d Cir. 1989)

(quoting <u>Baltimore Gas & Elec. Co v. Natural Resources Defense</u>

<u>Council</u>, 462 U.S. 87, 97 (1983)) (internal quotation and citation

omitted).  At issue here is NEPA's provision requiring that all

federal agencies:

> include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --
>> (i)  the environmental impact of the proposed action,
>> (ii)  any adverse environmental effects which cannot be avoided should the proposal be implemented,
>> (iii)  alternatives to the proposed action,
>> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

42 U.S.C. § 4332(2)(C).

The Council on Environmental Quality (CEQ), established

under NEPA, 42 U.S.C. § 4342, has promulgated regulations to

guide agencies in addressing the threshold question of whether a

particular action must be accompanied by the "detailed statement"

described in § 4332(2)(C), called an Environmental Impact

Statement (EIS).[0]  <u>See generally</u> 40 C.F.R. Parts 1507, 1508. When

considering a major action, the regulations require that "an

agency must undertake a comprehensive assessment of the expected

---

[0]These regulations were made binding on all agencies by Executive Order No. 11991, 3 C.F.R. 123 (1978), and are entitled to substantial deference even if they conflict with another agency's interpretation of NEPA, <u>Andrus v. Sierra Club</u>, 442 U.S. 347, 358 (1978).  <u>See also</u> <u>Morris County Trust for Historic Preservation v. Pierce</u>, 714 F.2d 271, 276 (3d Cir. 1983).

14

effects of [the] proposed action before it can determine whether that action is `significant' for NEPA purposes." Township of Lower Alloways Creek v. Public Serv. Elec. & Gas. Co., 687 F.2d 732, 740 (1982).  Agencies are directed to designate which classes of actions normally require EIS's, which classes normally require no environmental evaluation and may be regarded as categorical exclusions, and which classes fall in the middle and require Environmental Assessments (EA's) to determine whether they will have a significant impact and thus require EIS's.  40 C.F.R. § 1507.3(b)(2).  An EA provides either a determination that the action will have a significant environmental impact and hence requires an EIS, or a "finding of no significant impact" (FONSI) indicating that no EIS is needed.  Id. § 1508.9(a)(1); Lower Alloways Creek, 687 F.2d at 740.  "Thus, as a screening device, the environmental assessment allows agencies with limited resources to focus on truly important federal actions."  Lower Alloways Creek, 687 F.2d at 740 n.17 (internal quotations, alteration, and citation omitted).

**B.  Claim against the NRC**

**1.  Application of the Hobbs Act**

The gravamen of NJDEPE's NEPA claims is that the federal agencies involved in approving LIPA's fuel shipment did not analyze the environmental impact of the method and route of transportation or weigh transportation alternatives, as required by 42 U.S.C. § 4332(2)(C).  The district court held it lacked subject matter jurisdiction.  We agree.  The Hobbs Act provides:

> The court of appeals . . . has exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of --
> . . .
> (4) all final orders of the [NRC][0] made reviewable by section 2239 of title 42 . . . .

28 U.S.C. § 2342.  Section 2239 provides for review of NRC final orders granting, suspending, revoking or amending licenses, or issuing or modifying rules dealing with the activities of licensees.  Thus, the Hobbs Act requires "initial court of appeals review of all final orders in licensing proceedings." Florida Power & Light Co. v. Lorion, 470 U.S. 729, 737 (1985). The act "should be liberally construed to allow exclusive jurisdiction in the court of appeals."  Conoco, Inc. v. Skinner, 970 F.2d 1206, 1214 (3d Cir. 1992).

The district court treated NJDEPE's claim of inadequate environmental assessment as essentially a challenge to the

---

[0]The act here refers to the Atomic Energy Commission. Congress abolished the Atomic Energy Commission and transferred its licensing and regulatory functions to the Nuclear Regulatory Commission in 1974, 42 U.S.C. §§ 5801, 5841 (1988), so this provision now applies to the NRC.  See Baltimore Gas & Elec. Co., 462 U.S. at 90 n.2.

16

validity of two final NRC orders: the approval of PECo's license amendment and the issuance of a Certificate of Compliance to Pacific Nuclear Systems for its radioactive material containers. The court held those orders, and their accompanying environmental assessments, could only be challenged by petition to the court of appeals.

NJDEPE contends that because the NRC tried to avoid issuing a reviewable final order by fragmenting its decisionmaking, its action falls within an exception to the Hobbs Act and is reviewable in the district court. In the alternative, it argues that even if the district court lacked jurisdiction, we should view its appeal as a petition for review under the Hobbs Act, and hear its claims. Finally, NJDEPE maintains that its original claim asserted a NEPA violation by the Coast Guard over which the district court had jurisdiction.

## 2. Fragmented decisionmaking

NJDEPE bases its fragmented decisionmaking claim on Susquehanna Valley Alliance v. Three Mile Island Nuclear Reactor, 619 F.2d 231 (3d Cir. 1980), cert. denied, 449 U.S. 1096 (1981). There, a residents' association challenged an attempt to build and operate a water decontamination system to process radioactive water that accumulated after the Three Mile Island accident. The Alliance feared that partially decontaminated water would be released into the environment. Among its claims was that the NRC was violating NEPA by authorizing construction of the system to begin before preparation of an environmental evaluation of its disposal plan. The Alliance argued that the NRC was fragmenting

17

its decisionmaking -- it was delaying a final decision on how it would resolve the disposal problem, thereby eluding the scrutiny of an EIS, but nevertheless it had tacitly elected a partial solution through allowing construction of the decontamination system. Postponing preparation of an EIS until private parties had been permitted to expend large sums on construction, the Alliance said, would distort the final evaluation and choice of solution by the NRC and any reviewing court. Id. at 239-40. Yet because the case was still under consideration, there was no final order the Alliance could challenge under the Hobbs Act. Id. at 236.

We stated, "Segmentation of a large or cumulative project into smaller components in order to avoid designating the project a major federal action has been held to be unlawful," and then considered whether the district court had jurisdiction to compel NRC compliance with NEPA by prohibiting segmentation and forcing the preparation of an EIS. Id. at 240. We held that the NRC's discretion on the timing of its EIS was not unfettered, and that the district court was the proper forum for development of the record needed to determine when, under NEPA, the EIS was required. We concluded that "a claim that NRC is not complying with the National Environmental Policy Act states a cause of action over which the district courts have subject matter jurisdiction." Id. at 241.

NJDEPE contends similar fragmented decisionmaking in this case confers district court jurisdiction. NJDEPE argues it was left without a final order to challenge because no agency was

18

willing to acknowledge approving the barge shipments along the New Jersey coast or reviewed the environmental impact of these shipments and alternatives, and that therefore it may ask the district court to compel compliance with NEPA.

The record demonstrates otherwise. The NRC has not avoided its NEPA obligations by refusing to issue final orders. Rather, the NRC has issued several final orders connected with the Shoreham decommissioning; and one of these, PECo's license amendment, conveyed permission to transport the fuel, and included an appropriate EA.[0] What NJDEPE is really challenging is not the lack of NRC assessment but the way the NRC has evaluated the method and route of transport.

Under NRC regulations, the June 23, 1993 PECo license amendment to receive the Shoreham fuel also constituted a license to transport it. Any holder of an NRC license to receive and possess nuclear fuel is the beneficiary of a general NRC license "to transport, or to deliver to a carrier for transport," the material, using proper procedures and equipment. 10 C.F.R. §71.12(a) & (b).

Appropriately, then, the NRC's Environmental Assessment of the proposed amendment allowing receipt of the fuel analyzed the environmental impact. The analysis applied 10 C.F.R. §51.52, "Environmental effects of transportation of fuel and waste -- Table S-4." Table S-4 provides a generic analysis of the

---

[0]In evaluating the impact of its actions under NEPA the NRC follows the CEQ guidelines. 10 C.F.R. § 51.10(a). Amendments to licenses granted here require EA's. Id. § 51.20-51.22.

19

environmental impact of such transport.  If a transportation plan meets the standards set out in Table S-4, the transportation of the materials is deemed to have no significant impact.  The Environmental Assessment detailed how "[t]he proposed shipments meet the conditions specified in 10 C.F.R. 51.52(a)," and concluded the environmental impact of the transportation would be as set forth in the table, and that this impact would be "minimal."  58 Fed. Reg. 29010, 29011 (1993).

The fragmented decisionmaking argument relies on a claim that the agency avoided environmental analysis of an action by not making a final decision, so the argument is foreclosed if a final decision authorizing the action is identified.  Because the NRC, through the PECo amendment, made a final decision to license transportation of the irradiated fuel after analyzing the impact of transportation in the EA, Susquehanna cannot apply.[0]

NJDEPE argues that Table S-4's generic approach is inadequate under NEPA, which instead requires case by case analysis of transportation methods and routes; and that Table S-4, by its own terms, is inapplicable here.  We do not reach the merits of these arguments because, even if true, neither justifies the invocation of Susquehanna to lift the Hobbs Act's

_____

[0]NJDEPE shows it is aware of this logic by its efforts to deny that it is challenging any order in particular.  For example, it states it "has no quarrel with and therefore has no interest in challenging PECo's license amendment which does not appear to approve a transportation route through New Jersey's waters; it instead appears merely to allow PECo to receive and possess the subject fuel."  Brief for NJDEPE at 23.

jurisdictional bar, for both constitute a challenge to a final NRC order.

NJDEPE's contention that generic evaluation of the impact of radioactive materials transport does not satisfy NEPA is at the center of its NEPA claims. The NRC maintains the S–4 Table correctly concludes, based on extensive study, that any transport by barge, rail, or truck meeting certain requirements[0] will have no significant environmental impact, so that there is no need to consider various possible routes and methods of transportation.[0] In support, the NRC cites to <u>Baltimore Gas &</u>

_____

[0]Radioactive materials shipments must meet NRC standards for radiation emission levels, 10 C.F.R. § 51.52, packaging, <u>see generally</u> <u>Id.</u> Part 71, including standards for lifting and tieing-down packages and for external radiation levels, <u>id.</u> Part 71 Subpart E. The regulations also require specific tests of packages under "normal conditions" and "hypothetical accident conditions." <u>Id.</u> Part 71 Subpart F.

[0]Among the studies supporting Table S–4 is "Environmental Survey of Transportation of Radioactive Materials to and from Nuclear Power Plants," WASH–1238 (1972), J.A. at 328. It estimates radiation dosages to transportation workers and the general public from transport by truck, rail, and barge, and considers the odds and effects of different kinds of accidents by each mode of transport. Calculations are based on transportation in approved packaging. The conclusion is that the risk of accident for any form of transportation is about 1 in a million per vehicle mile, and that only 1% of these accidents would involve a severe impact or fire. <u>Id.</u> at 9, J.A. at 330. While the study notes that effects of an accident would depend on, among other things, the population density where the accident occurred, and that requirements for special routing were considered, it states that the advantages of requiring special routing of shipments were determined to be too small to merit implementation. <u>Id.</u> at 10, J.A. at 331.

NJDEPE "does not really quarrel with LIPA's contention that the study purportedly supporting Table S–4 (the table upon which the subject environmental assessment allegedly was based) concludes that the chances of a barge accident resulting in the release of a significant amount of radiation are relatively

21

Elec., 462 U.S. at 101, where the Supreme Court approved a generic evaluation by the NRC of the impact of the storage of solid nuclear waste, commenting, "[t]he generic method chosen by the agency is clearly an appropriate method of conducting the `hard look' required by NEPA." In response, NJDEPE cites to Limerick Ecology Action v. NRC, 869 F.2d 719 (3d Cir. 1989), where we overturned the NRC's generic policy that an EIS for a nuclear plant need not consider the plant's "severe accident mitigation design alternatives." Observing that the impact of such design alternatives would vary with each plant's design and the population density of its environs, we stated, "it is axiomatic that the generic approach of Baltimore Gas will not suffice where the underlying issues are not generic." Id. at 738. NJDEPE contends that the underlying issues determining the impact of transportation of radioactive waste are similarly not generic, because the impact depends on the population levels each route passes through and the risks of accident for each method of transportation.

Whether or not this argument has merit, it does not support a claim of fragmented decisionmaking by which the NRC has avoided evaluating the impact of the transportation. This evaluation has taken place, and NJDEPE's complaint challenges the method of evaluation prescribed by the rule, Table S-4, and the evaluation's conclusion. Count I of the complaint therefore challenges a final order of the NRC, over which the court of

slight." Reply Brief for NJDEPE at 17. Rather, it disputes the use of the table in this situation.

22

appeals, not the district court, has jurisdiction.  Furthermore, while we do not rule on PECo's and the United States' argument that NJDEPE was required to exhaust all administrative remedies before petitioning for review in this court, we note that a number of administrative avenues might also have provided relief.[0]  NJDEPE could have petitioned the NRC for a new rulemaking process under 10 C.F.R. § 2.802(a), which provides that "[a]ny interested person may petition the Commission to issue, amend or rescind any regulation."  Alternatively, NJDEPE could have petitioned for a waiver of or exception to application of Table S-4 in PECo's license proceeding under 10 C.F.R. §2.758(b).  To do so, it would have had to file a petition to intervene as an interested party in the proceeding under 10 C.F.R. § 2.714.[0]  Indeed, on October 8, before oral argument, NJDEPE filed such a petition.  See 58 Fed. Reg. 58203 (1993).  Finally, NJDEPE could have petitioned to modify, suspend, or

---

[0]Even if exhaustion of administrative remedies is required, we do not condemn parties in NJDEPE's position to entanglement in administrative proceedings until their objections are moot.  We have previously commented that the All Writs Act, 28 U.S.C. §1651 (1988), appears to allow the court of appeals to grant pendente lite relief to preserve the status quo while the NRC considers petitions such as those suggested below.  Susquehanna, 619 F.2d at 237 (citing FTC v. Dean Foods Co., 384 U.S. 597, 604-05 (1966) (28 U.S.C. § 1651(a) authorizes courts of appeals to issue preliminary injunctions preserving status quo pending final agency action in matters over which they had exclusive review jurisdiction under Clayton Act, 15 U.S.C. § 21(c) (1976))).
[0]NJDEPE did not seek to intervene before the amendment was issued on June 23, 1993, but claims it did not learn of the plan to ship by barge until around that date.  It could have petitioned to intervene even after the amendment was issued, under the provision for late intervention for good cause.  10 C.F.R. § 2.714(a)(1).

23

revoke PECo's amended license under 10 C.F.R. § 2.206, alleging a license violation or "potentially hazardous conditions or other facts deemed to be sufficient ground for the proposed action," id. § 2.202(a)(1).

Our resolution of NJDEPE's second argument against the NRC's use of Table S-4, that the rule "on its face is inapplicable to the issue of how to transfer partially spent fuel from one reactor for use at another," is similar. NJDEPE contends that Table S-4 refers to shipment of radioactive waste from a reactor, not to transfer of partially irradiated fuel between reactors. The NRC responds that the fuel here is less radioactive than fully irradiated waste, and cites to its previous decisions that the table is equally applicable to shipment of fuel between reactors.[0] Regardless of the merits, this is a challenge to the NRC's application of a rule in its evaluation of the transportation, demonstrating that there was an evaluation to challenge, and that the NRC did not fragment its decisionmaking.

In sum, NJDEPE's real complaint is not that there is no final order to challenge, but rather that it disagrees with the NRC's form of analysis and conclusions. These challenges cannot

---

[0]See In re Duke Power Co. (Catawba Nuclear Station, Units 1 & 2), ALAB-825, 22 N.R.C. 785, 793 (1985) (rejecting contention that Table S-4 only applies where spent fuel is shipped from reactor to reprocessing plant, stating, "the [NRC]'s generic determination of transportation impacts in the regulation is equally applicable to the transshipment of spent fuel between reactors as well as to a hypothetical reprocessing facility because it is the same fuel regardless of destination."); accord In re Carolina Power & Light Co. (Shearon Harris Nuclear Power Plant), ALAB-837, 23 N.R.C. 525, 544 (1986).

be maintained in the district court, because the Hobbs Act mandates "initial court of appeals review of all final orders in licensing proceedings."  Florida Power & Light Co., 470 U.S. at 737.

### 3.  The appeal as a Hobbs Act petition to the Court of Appeals

NJDEPE contends that even if the district court correctly dismissed its claims against the NRC for lack of jurisdiction, its appeal may be taken as a petition for review of the NRC's final orders, invoking the exclusive appellate jurisdiction of the court of appeals.  The Hobbs Act provides, "Jurisdiction [in the court of appeals] is invoked by filing a petition as provided by [28 U.S.C. §] 2344."  28 U.S.C. § 2342. Section 2344 requires a petition for review of an order to be filed with the appellate court within 60 days after the order's entry, and to specify the nature of the proceeding for which review is sought.  Id. § 2344 (1988).  Federal Rule of Appellate Procedure 15(a), "Petition for Review of Order; Joint Petition," which according to the Advisory Committee note supersedes 28 U.S.C. § 2344, also requires specification of the order for which review is sought.[0]  NJDEPE has not complied with these procedures.

By itself, NJDEPE's appeal allows us to consider whether the district court's dismissal of the claim against the

---

[0]Rule 15(a) does not specify the time limit for bringing petitions for review, but we apply the 60-day limit from § 2344. See Conoco, 970 F.2d at 1213 n.8 (applying § 2344's 60-day limit after adoption of Rule 15(a)).

25

NRC was proper, not to consider the merits of the claim. Just as when the lower federal court improperly asserts jurisdiction, "`we have jurisdiction on appeal, not of the merits but merely for the purpose of correcting the error of the lower court in entertaining the suit,'" Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) (quoting United States v. Corrick, 298 U.S. 435, 440 (1936)), when the lower court has properly found it lacked jurisdiction, we have appellate jurisdiction not of the merits but merely for the purpose of affirming the court's dismissal.

Nor can NJDEPE's appeal serve as a stand-in for a Hobbs Act petition for review. NJDEPE's notice of appeal was filed October 13, 1993, well beyond 60 days from the June 23, 1993 order, and more than 60 days from August 9, when NJDEPE indisputably learned from LIPA's application for a New Jersey Certificate of Handling that shipments would be by barge. Even in a proper petition, this delay would be fatal, for "[t]he 60 day period for seeking judicial review set forth in the Hobbs Act is jurisdictional in nature, and may not be enlarged or altered by the courts." Natural Resources Defense Council v. NRC, 666 F.2d 595, 602 (D.C. Cir. 1981). Furthermore, the notice of appeal would be substantively deficient as a petition for review, for it challenges the district court's ruling, rather than "designat[ing] . . . the [agency] order or part thereof to be reviewed." Fed. R. App. P. 15(a). For these reasons, we will affirm the district court's dismissal for want of jurisdiction, and will not review the merits of the claim. See Conoco, 970

26

F.2d at 1213, 1216 (affirming Hobbs Act dismissal of claims against Maritime Administration and Coast Guard, and taking jurisdiction only of claim against Maritime Administration which had also been raised in protective petition for review), and at 1213 n.8 (noting that appeal came more than 60 days after the Coast Guard order being challenged, thus exceeding 28 U.S.C. §2342's time limit for petitions for review); Bucks County Cable TV, Inc. v. United States, 427 F.2d 438, 442 (3d Cir.), cert. denied, 400 U.S. 831 (1970) (declining to review under Hobbs Act district court's exercise of jurisdiction of claim against Federal Communications Commission because plaintiff-appellant had also filed timely petitions for review with court of appeals); Green v. Brantley, 981 F.2d 514, 521 n.2 (11th Cir. 1993) (holding district court lacked jurisdiction of appellee's claim against Federal Aviation Administration because 49 U.S.C. § 1486 gave appellate court exclusive jurisdiction; declining to accept appeal as a petition for review); see also California Save Our Streams Council, Inc. v. Yeutter, 887 F.2d 908 (9th Cir. 1989) (upholding district court finding of lack of jurisdiction over claims against Federal Energy Regulatory Commission because 16 U.S.C. § 825l(b) confers exclusive jurisdiction on circuit courts; remanding without holding that appeal could serve as petition to review FERC decision).

### C.  Claim against the Coast Guard

Because it read NJDEPE's NEPA claims in Count I as a challenge to final orders of the NRC, the district court dismissed the count for lack of jurisdiction.  But in that count,

27

NJDEPE stated its NEPA claim jointly against the NRC and the Coast Guard.[0] We will therefore address the separate claim that the Coast Guard violated NEPA. Although we find jurisdiction in

---

[0]The complaint stated, "NRC and the Coast Guard failed to comply with the clear nondiscretionary requirements of NEPA and NEPA's implementing regulations when they approved the proposed shipment of fuel from LIPA to PECo without assessing the risks and alternatives of the transfer and transport of LIPA's fuel." Verified Complaint ¶ 30 at 18, J.A. at 23.

It is not clear that NJDEPE stated an independent NEPA claim against the Coast Guard. At some points it appears NJDEPE merely claims the Coast Guard and the NRC fragmented decisionmaking among themselves so that neither performed a major federal action, and neither took responsibility for allowing transport of the fuel. On appeal NJDEPE states:

> NJDEPE's claim is not that the Coast Guard on its own committed an independent violation of NEPA, but instead that it, together with the NRC, violated NEPA through various actions and inactions, the combination of which resulted in LIPA's being allowed to transport its nuclear fuel through New Jersey's coastal waters without any analysis of the impact of that transportation on those waters.

Reply Brief for NJDEPE at 18–19. Thus construed, NJDEPE's NEPA complaint against the Coast Guard and the NRC is a variation of the Susquehanna fragmented decisionmaking claim. In Susquehanna we addressed a single agency's fragmentation of a decision to take a major action into a number of smaller decisions in order to avoid NEPA obligations; here NJDEPE's theory appears to be that NEPA is violated where a number of agencies fragment a major federal action into smaller, non–major decisions, hence avoiding the environmental analysis of the action required under 42 U.S.C. § 4332.

We need not reach the merits of this theory of NEPA liability, for as our discussion above indicates, such fragmentation is not present in this case. We have found the NRC did issue a final order authorizing the transport of the nuclear fuel, the PECo license amendment, and took responsibility under NEPA by performing an "analysis of the impact of that transportation on those waters." Hence, any claim that the Coast Guard, though it took no major action, violated NEPA through fragmentation of a major action with the NRC must fail. We give NJDEPE the benefit of the doubt, however, and also assume it alleges the Coast Guard on its own took a major federal action significantly affecting the environment.

28

the district court would have been proper, the Coast Guard is entitled to summary judgment on the claim.

The Hobbs Act does not bar district court jurisdiction of this claim against the Coast Guard. The action challenged is that of the Captain of the Port of Long Island Sound, in granting conditional approval of LIPA's Operations Plan that described the planned barge shipments. Although the Hobbs Act grants exclusive jurisdiction in the court of appeals over certain rules, regulations, and orders of the Secretary of Transportation[0] relating to the nationality of ship ownership, it does not so limit jurisdiction of challenges to Coast Guard maritime safety activities. See 28 U.S.C. § 2342(3)(A) (1988).

The district court had jurisdiction of this claim. We stated in Susquehanna that "[e]nforcement of the environmental impact statement requirement generally has been assumed to be within the subject matter jurisdiction of the district courts," Susquehanna Valley Alliance, 619 F.2d 231, 240 (1980), a holding as applicable to the Coast Guard action here as it was to the NRC action in Susquehanna. See 28 U.S.C. §§ 1331, 1337, 1361, and 5 U.S.C. §§ 701-06.

The United States contends the Coast Guard was under no NEPA obligation because it did not take a major federal action, and that even if NEPA does apply, Coast Guard NEPA implementation guidelines identify operations to carry out statutory marine

---

[0]Except during times of war and as otherwise declared by the President, the Coast Guard is a service in the Department of Transportation. 14 U.S.C. §§ 1, 3 (1988).

safety duties as "categorical exclusions" that do not require Environmental Impact Statements. We agree there was no major federal action by the Coast Guard, and therefore it was not required to perform an environmental assessment or environmental impact statement.[0] We do not reach the categorical exclusion argument.[0]

LIPA submitted its Operations Plan to the Captain of the Port of Long Island Sound June 7, 1993. The cover letter stated, "This proprietary submittal has been developed in accordance with the guidance in American National Standard for

---

[0]This court has previously reserved decision on the question of the standard of review to be applied to an agency's decision not to prepare an environmental impact statement. See, e.g., Morris County Trust for Historic Preservation v. Pierce, 714 F.2d 271, 278 n.5 (3d Cir. 1983); Township of Springfield v. Lewis, 702 F.2d 426, 436 (3d Cir. 1983). We will do so here also, as there is no need resolve the issue to decide the case: we find the Coast Guard's decision here to be reasonable under the circumstances, so it necessarily satisfies the lower abuse of discretion standard as well.

[0]It is not clear whether the Captain of the Port's approval of LIPA's Operation Plan would qualify as a categorical exclusion under the Coast Guard's procedures. Paragraph 2.B.2.c. of Commandant Instruction M1 6475.1B lists "[a]ctions performed as a part of Coast Guard operations to carry out statutory authority in the areas of maritime safety [or] protection of the environment" as categorically excluded from the EA or EIS requirement because they have no significant effect on the environment. However the Instruction also states that an EA or EIS should be prepared for otherwise excluded actions that are "likely to involve . . . substantial controversy because of effects on the human environment." We note that there is no indication that these procedures were published for public review and comment as required by 5 U.S.C. § 553, and so do not have the status of rules. See also 40 C.F.R. § 1507.3(a) (agency procedures for NEPA implementation shall be adopted only after opportunity for public review). At any rate, whether the Coast Guard would call its action a categorical exclusion or not, we find the action did not amount to a major federal action entailing NEPA obligations.

30

Highway Route Controlled Quantities of Radioactive Materials --

Domestic Barge Transport, ANSI N14.24-1985." J.A. at 156. The

plan detailed equipment and facilities to be used, communications

procedures, emergency response plans, radiation safety

procedures, security measures, and the route of travel.

The Captain, H. Bruce Dickey, responded on July 27,

1993, that he had reviewed the shipping plan and stated, "final

approval is contingent on satisfactory internal structural

inspections of the Loveland barges to be used for the fuel

shipments." J.A. 159. The letter continued with instructions on

reporting positions and emergencies during shipping.

We find this exchange between the Coast Guard and LIPA

does not amount to a major federal action, and therefore § 4332,

which requires an environmental impact statement for "major

Federal actions significantly affecting . . . the human

environment," does not apply. Where a non-federal party

voluntarily informs a federal agency of its intended activities

to ensure that they will comply with law and regulation, and to

facilitate the agency's monitoring of the activities for safety

purposes, the agency's review of the plan does not constitute a

major federal action.[0] Here, it is clear that LIPA's submission

---

[0]This court has set forth a dual standard for determining whether an environmental impact statement is required: we consider whether a federal action is "major," in terms of the level of federal resources and authority committed to it, and whether it "significantly" affects the environment. NAACP v. Medical Ctr., Inc., 584 F.2d 619, 627 (3d Cir. 1978). We recognize that the Council on Environmental Quality has interpreted § 4332(2)(C) as setting forth a unitary standard: "*Major Federal action* includes actions with effects that may be major and which are potentially subject to Federal control. Major reinforces but does not have a

31

of its Operations Plan was not required for it to ship the fuel. The American National Standards Institute standard on barge transport of radioactive materials under which LIPA submitted its Operations Plan does not set out legal requirements; rather, it states, "The use of American National Standards is completely voluntary." Brief for Federal Appellees, Addendum II.

meaning independent of significantly." 40 C.F.R. § 1508.18 (citation omitted); see also 43 Fed. Reg. 55978, 55989 (1978). Despite our deference to the CEQ's regulations, Andrus v. Sierra Club, 442 U.S. 347, 358 (1978), we question its interpretation of NEPA in this instance, for the reasons we set out in NAACP:

> First, the two-pronged approach follows the statutory language more closely than the unitary approach; second, the unitary approach would give virtually no effect to the word "major," and thus would run counter to the requirement that a court give effect to all words of a statute when construing it; and third, the Government reasonably could have concluded that a minimal federal relationship to a project having an environmental impact would not warrant expenditure of scarce resources and critical time for preparation of a needless impact statement.

N.A.A.C.P., 584 F.2d at 627. This court and others have continued to use the dual standard. See Lower Alloways, 687 F.2d at 740 n.15. Sugarloaf Citizens Ass'n v. Federal Energy Regulatory Comm'n, 959 F.2d 508, 512 (4th Cir. 1992) ("Only proposals for a `major' federal action therefore require review by an agency under NEPA," (citing NAACP, 584 F.2d at 634)); Sierra Club v. Penfold, 857 F.2d 1307, 1314 (9th Cir. 1988) (holding agency's approval of mining proposals constituted marginal, not major, federal action, so that agency was not subject to NEPA requirements). We need not resolve the conflict at this point, however, because the CEQ's definition would not lead us to a different result. Even using that definition, we would focus on the federal action, not the action of a private party. Where the federal agency lacks authority to control the private activity, and is merely involved in an advisory capacity at the request of the private party, there is no "action[] with effects that may be major and which are potentially subject to Federal control."

32

Similarly, the Coast Guard circular on barge transportation of radioactive materials states that the ANSI standard "advises" shippers to consult the Coast Guard regarding emergency response plans, and explains, "This standard is intended to be a voluntary industry standard."  J.A. at 154.[0]

Federal approval of a private party's project, where that approval is not required for the project to go forward, does not constitute a major federal action.[0]  In NAACP, we described three classes of agency actions requiring environmental analysis under NEPA:  first, where the agency itself undertook a project; second, where the agency supported a project by contract, grant, loan, or other financial assistance; and third, where the agency enabled the project by lease, license, permit, or other

---

[0]Our conclusion that permission from the Coast Guard for shipment of the Shoreham fuel was not required is fortified by reference to regulations that categorize certain materials, such as the uranium-235 at issue here, as "dangerous cargo," 33 C.F.R. § 126.07; 49 C.F.R. § 172.101, and other material, particularly certain explosives, as "designated dangerous cargo," 33 C.F.R. §126.09.  The Coast Guard has promulgated by regulation a general handling permit for "dangerous cargo."  Id. § 126.27.  For "designated dangerous cargo," however, the Captain of the Port must issue a permit for each transaction (handling, storage, etc.) involving the material, id. § 126.19.  Thus, the Coast Guard has apparently made a conscious choice not to engage in licensing activities with respect to the material at issue here.

[0]The CEQ lists categories into which federal actions "tend to fall," and among these is "[a]pproval of specific projects . . . . Projects include actions approved by permit or other regulatory decision as well as federal and federally assisted activities." 40 C.F.R. § 1508.18(b)(4).  It does not, however, define approval.  Regardless of whether § 1508.18(b)(4) would designate a non-required, voluntarily sought approval as a federal action, such an approval is not a major federal action.

33

entitlement for use.[0]  NAACP, 584 F.2d at 630.  In NAACP, the Secretary of the Department of Health, Education, and Welfare had approved a hospital's capital expenditure plan after certification by local and state officials that the renovation and expansion were necessary.  Without this approval, the Secretary might have withheld a portion of federal payments for patient charges under Medicare, Medicaid, and other health programs.  The plaintiffs claimed the Secretary should have filed an environmental impact statement before issuing his approval. Id. at 624.

As here, the question in NAACP regarded the third category of action:  whether the government had enabled the project in such a way as to constitute a major federal action. Observing that the hospital could have legally pursued its renovation and expansion without the Secretary's approval, and that the Secretary's duties of approval were ministerial once the state agencies had approved the expenditure as necessary and did not include the discretion to consider environmental impacts of the project, we held there was no major federal action.  We explained, "When the agency `enables' another to impact on the environment, the court must ascertain whether the agency action is a legal requirement for the other party to affect the environment and whether the agency has any discretion to take

---

[0]We note that where an agency imposes a de facto requirement that it grant approval before a private action is taken, through, for example, a policy governing its exercise of discretionary authority, this may be the equivalent of a legal requirement that the private party seeking to act must obtain a license or permit.

34

environmental considerations into account before acting." Id. at 634 (emphasis added). We also rejected the argument that the Secretary's approval was a major federal action because, for financial reasons, the renovation and expansion would not be undertaken but for his approval. The classification of enabling action as major federal action "does not extend to Government action which amounts to less than a legal precondition," we explained. Id. at 632.

Other courts have also held that where federal approvals are not legal predicates to private actions, the approvals are not major federal actions entailing NEPA obligations. In Sugarloaf Citizens Ass'n, a citizen's group challenged the Federal Energy Regulatory Commission's (FERC) certification of a proposed waste-to-energy facility as a "co-generation facility." This certification gave the facility the right to deal with the local electric utility at favorable rates, and, according to the citizens, was critical to the facility's economic viability. 959 F.2d at 513. The Fourth Circuit stated, "a non-federal project is considered a `federal action' if it cannot begin or continue without prior approval by a federal agency and the agency possesses authority to exercise discretion over the outcome." Id. at 512 (internal quotation marks and citations omitted). Noting that the facility received no direct federal assistance, that FERC's certification was a ministerial determination based on technical and ownership qualifications, and that the facility legally could have been built without certification, the court affirmed FERC's determination that there

was no major federal action for NEPA purposes. Id. at 513-14. See also Sierra Club v. Penfold, 857 F.2d 1307, 1314 (9th Cir. 1988) (where Bureau of Land Management required advance notice of development of gold mine and monitored compliance with environmental rules, but could not require approval before development of mine began, federal action "marginal" rather than "major"); Named Individual Members of San Antonio Conservation Soc'y v. Texas Highway Dep't, 496 F.2d 1017, 1023-24 (5th Cir. 1974) (no major federal action where state sought Army Corps of Engineers' opinion on effect of highway project on flood control and Corps responded it had no objection, but where there was no legal requirement that state seek Corps approval), cert. denied, 420 U.S. 926 (1975).

In the converse situation, we have held that where a federal agency has legal control over a private project, its approval can amount to a major federal action. Where the Department of Housing and Urban Development (HUD) had approved and contracted to finance a town's urban renewal project before NEPA's 1969 enactment, and the town's development authority voted in 1980 to demolish a historical building, a preservation organization claimed NEPA required HUD to perform an environmental analysis. Morris County Trust, 714 F.2d 271 (3d Cir. 1983). We found HUD had continuing authority over the project, because the loan contract required the development authority to submit data on proposed actions to HUD, and HUD in turn could withhold payment if it found an action violated federal law or regulation. Therefore HUD was required to

consider the environmental effects of its action under § 4332 and related regulations.  Id. at 278.  See also Davis v. Morton, 469 F.2d 593 (10th Cir. 1972) (Department of Interior performed major federal action by approving lease of Indian lands, where approval was required by statute).  Here, the Coast Guard approval was not required before the shipments could take place, so the Coast Guard did not have control over them.[0]  The Coast Guard did not, therefore, perform a major federal action in relation to the shipments, and was not obligated to analyze their environmental impact under NEPA.

**IV**.

NJDEPE claims that the NRC, the Coast Guard, LIPA, and PECo violated the Coastal Zone Management Act requirement conditioning certain federal licenses and permits on submission of "consistency certifications" showing that proposed activities

---

[0]As discussed below, the Coast Guard possesses a number of discretionary enforcement powers it conceivably could have applied to the LIPA shipment, but did not.  NJDEPE only mentions these in relation to the CZMA claim, but we note that such enforcement powers do not give the Coast Guard ongoing legal control of the shipments for NEPA purposes.  Indeed, the Coast Guard's non-action in this regard does not constitute federal action at all under NEPA.  According to the CEQ, federal "[a]ctions include the circumstance where the responsible officials fail to act and that failure to act is reviewable by courts or administrative tribunals under the Administrative Procedure Act or other applicable law as agency action."  40 C.F.R. § 1508.18.  Here, the Coast Guard's "decision not to take enforcement action should be presumed immune from judicial review under" the Administrative Procedure Act.  Heckler v. Chaney, 470 U.S. 821, 832 (1985).  See also Defenders of Wildlife v. Andrus, 627 F.2d 1238 (1980) (Secretary of Interior's decision not to exercise power to stop state's wolf-killing program not a major federal action); Alaska v. Andrus, 591 F.2d 537 (9th Cir. 1979) (same).

37

comply with the state's coastal management program.  NJDEPE wants

LIPA and PECo ordered to submit consistency certifications.  The

claim against the NRC that its licenses to LIPA (regarding the

decommissioning of Shoreham) and PECo (regarding receipt of the

fuel) violate the CZMA are, like the other claims against the

NRC, jurisdictionally barred from the district court and hence

will have to be dismissed.[0]  We will affirm the district court's

grant of summary judgment to the Coast Guard on the CZMA claim,

and instruct the district court to dismiss the CZMA claim against

LIPA and PECo.

### A.   The Coastal Zone Management Act

The CZMA aims to preserve, protect, and restore the

nation's coast, in part by encouraging and assisting states in

the development of coastal zone management programs.  16 U.S.C.

§1452(1)&(2).  To promote cooperation by federal agencies with

state management efforts, it provides that any applicant for a

federal license or permit to conduct an activity that will affect

the coastal zone:

> shall provide in the application to the licensing or
> permitting agency a certification that the proposed
> activity complies with the enforceable policies of the
> state's approved program and that such activity will be
> conducted in a manner consistent with the [state's
> approved coastal management] program.[0]

---

[0]The district court did not specifically address the CZMA claims
against the NRC, LIPA, or PECo in its opinion.

> [0]The statute also states a general
> cooperation requirement: Each Federal agency
> activity within or outside the coastal zone
> that affects any land or water use or natural
> resource of the coastal zone shall be carried
> out in a manner which is consistent to the
> maximum extent practicable with the

38

Id. § 1456(c)(3)(A) (Supp. IV 1992).  The statute sets out
procedures for granting or withholding the federal license
depending on the judgment of the state and the Secretary of
Commerce with respect to the proposal's consistency with the
state program.  Id.

The National Oceanic and Atmospheric Administration
(NOAA) of the Commerce Department has promulgated regulations
implementing the CZMA's consistency requirements.  15 C.F.R. Part
930.  The regulations require state agencies to develop a list of
federal license and permit activities that are likely to affect
the coastal zone and that the state wishes to review for
consistency.  The list is included in the state's management
program, which is submitted to the Secretary of Commerce for
approval.  15 C.F.R. § 930.53(b).  The list may be amended by the
state after consultation with the affected federal agency and
approval of the Assistant Administrator of NOAA.  15 C.F.R.
§930.53(d).  States are also directed to monitor unlisted federal
license and permit activities, and may inform the federal agency
and applicant that they seek consistency certification of a
particular activity within 30 days of notice of the activity; if
the request is untimely "the State agency waives its right to
review the unlisted activity."  Id. § 930.54(a).  The Assistant
Administrator of NOAA must approve the request for consistency
review of an unlisted license application.  Id. § 930.54(c).

---

enforceable policies of approved State
management programs.
Id. § 1456(c)(1)(A) (Supp. IV 1992).

39

An applicant for a license selected for consistency review must submit to the federal agency and the state a certification that the proposed activity is consistent with the state's coastal zone management program, along with certain required information. Id. §§ 930.57, 930.58. The regulations provide for state agency review of consistency certifications, and means to resolve state objections to such certifications. Id. §§ 930.59-930.66. Licenses may not issue until CZMA requirements are satisfied. Id. § 930.53(e).

**B. The Coast Guard Action**

NJDEPE contends LIPA's submission of its Operations Plan constituted an application for a required federal license or permit, thereby triggering the CZMA's consistency review requirements, and the Coast Guard improperly granted a license or permit before those requirements were met. The Coast Guard approval does not fall within a category of license listed in New Jersey's coastal zone management program as requiring consistency review. Furthermore, as we discussed in addressing the NEPA claims, we agree with the district court that no required federal license or permit was applied for or granted, nor should there have been. Therefore, consistency review was not called for.

None of the licenses listed for consistency review in New Jersey's approved "Coastal Management Program" relates to the Coast Guard action in this case. J.A. at 290; 7 N.J.A.C. § 7E. NJDEPE cites its Federal Consistency in New Jersey's Coastal Management Program -- A Handbook (Jan. 1991), which lists licenses for which applicants "should consult with [NJDEPE's

40

Division of Coastal Resources] regarding [their] consistency status."  J.A. at 281.  This list includes "[p]ermits and authorization for the handling of dangerous cargo by vessels in U.S. ports" issued pursuant to 46 U.S.C. § 170.  Id. at 282.  But even if such a permit was issued (we note that none is mentioned in the letter, and that no New Jersey port was involved in the journey), the Handbook does not represent an amendment to the approved coastal program, because it was not approved by NOAA after consultation with the affected agency, as the regulations require.[0]  15 C.F.R. § 930.53(d).  Thus, such permits are not officially listed for consistency certification.

Because the Coast Guard did not issue a license listed in New Jersey's Coastal Management Program, the Coast Guard action could only be submitted to consistency review as an "unlisted Federal license and permit activit[y]" under 15 C.F.R. § 930.54(a), which requires the state agency to inform the federal agency of the requested review within 30 days of the state's notice of the application for such license or permit.  NJDEPE requested consistency certification in letters to the Coast Guard dated September 8, 1993, and to NOAA, dated September 15 and 28.

We need not inquire into the timeliness of NJDEPE's request for consistency review of the Coast Guard action because we have found the Coast Guard did not issue "a required Federal

---

[0]The handbook states on its cover, "These guidelines supplement, but are not part of the New Jersey Coastal Management Program, September 1980."  J.A. at 271.

41

license or permit."[0]  The voluntary submission of an Operations

Plan for review by the Coast Guard does not make LIPA an

"applicant for a required Federal license or permit" under 16

U.S.C. § 1456(c)(3)(A).  LIPA sought review of its Operations

Plan for general compliance with law and regulation, and also

gave information to the Coast Guard for coordination and safety

purposes.  The use of the term "approval" in the letter from the

Captain of the Port does not create a license or permit

requirement for this kind of shipping.[0]

NJDEPE points out that the Coast Guard had

discretionary enforcement powers which they did not exercise with

respect to the LIPA shipment.  These powers are relevant here

only to show the nature of the Coast Guard's approval of the

Operations Plan -- the Coast Guard saw no violations of law or

---

[0]Although we reach our decision independently, we note that NOAA
came to the same conclusion.  In rejecting NJDEPE's request for
consistency review, NOAA concluded:
> LIPA has not applied for a Federal license or
> permit, and moreover, the Coast Guard has not
> proposed any activities concerning the
> shipment.  LIPA was not legally required to
> present the Coast Guard with its operation
> plan for review, but elected to do so on a
> voluntary basis.
Letter from Frank Maloney, NOAA, to Jeanne K. Fox, NJDEPE (Oct.
1, 1993) J.A. 230-31.

[0]Section 930.51(a) of 15 C.F.R. defines "Federal license or
permit" as "any authorization, certification, approval, or other
form of permission which any Federal agency is empowered to issue
to an applicant."  (Emphasis added.)  Arguably, the Coast Guard
response to LIPA's Operations Plan could qualify as such an
approval, although we would hesitate to apply the term to a mere
refusal to exercise discretionary enforcement powers.  We need
not decide whether the definition applies here, however, for even
if the Coast Guard did issue such an approval, the approval was
not required before shipment.

42

regulation in the plan, and found no need to exercise its discretionary powers. The Coast Guard did not, for example, exercise its powers under the Ports and Waterways Safety Act, 33 U.S.C. §§ 1221-32 (1988 and Supp. IV 1992), particularly the power of the Secretary of Transportation (delegated to the Coast Guard under 49 C.F.R. § 1.46) to order a vessel "to operate or anchor in a manner he directs" if he believes the vessel does not comply with applicable regulation, law or treaty, or for other safety reasons, 33 U.S.C. § 1223(b). Furthermore, the Coast Guard did not respond to the Operations Plan by exercising discretionary powers to supervise and control movement of vessels for protection of the vessel, waterfront facilities, or U.S. waters, 33 C.F.R. § 6.04-8, to require the securing of permits for handling, storage, loading and unloading dangerous cargo, id. § 6.12-3, or to supervise the handling, etc. of dangerous cargo, id. § 126.29. A list of discretionary powers, however, may not convert the Coast Guard's non-action into a grant of a required license or permit.

Because no required federal license or permit was involved in the exchange between LIPA and the Coast Guard, the Coast Guard did not violate the CZMA by not requiring a consistency certification from LIPA.

### C. Claims against PECo and LIPA

NJDEPE also complains PECo and LIPA violated the CZMA by receiving federal licenses without submitting consistency certifications. These claims suffer from a defect which the CZMA claims against the federal agencies did not. While federal

43

statutes allow injured parties to sue for judicial review of federal agency action, see, e.g., 5 U.S.C. §§ 701-06, CZMA claims against private parties must be grounded in a right of action found in the CZMA itself.  Because we find the CZMA creates no such right of action, these claims must fail.[0]

Where a statute does not explicitly create a right of action for a particular party, a court may find such a right implied only where it can confidently conclude Congress so intended.  Otherwise, "[i]mplication of private rights of action may `alter the remedial scheme devised by Congress for the enforcement of statutory programs and . . . place the judiciary in the role of enunciating or modifying policy decisions properly the preserve of the legislature.'"  American Telephone & Telegraph Co. v. M/V Cape Fear, 967 F.2d 864, 866 (3d Cir. 1992) (quoting United States v. FMC Corp., 717 F.2d 775, 780 (3d Cir. 1983)) (AT&T).  In determining "the ultimate issue [of] whether Congress intended to create a private right of action," California v. Sierra Club, 451 U.S. 287, 293 (1981), we follow the four-part test set out by the Supreme Court in Cort v. Ash:

> First, is the plaintiff `one of the class for whose especial benefit the statute was enacted,' -- that is, does the statute create a federal right in favor of the plaintiff?  Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?  Third, is it consistent with the underlying purposes of the legislative scheme

---

[0]We find only one published opinion on this question, New York v. DeLyser, 759 F. Supp. 982 (W.D.N.Y. 1991), which concludes the CZMA does not imply a state right of action against private parties.

to imply such a remedy for the plaintiff? [Fourth,] is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

Cort v. Ash, 422 U.S. 66, 78 (1975) (citations omitted).[0] The Court has indicated that the first two criteria are of primary importance, and "[i]f they do not point toward a private right, the remaining two `cannot by themselves be a basis for implying a right of action.'  By the same token, if the statute and legislative history reveal congressional intent to create a right of action, `there is no need . . . to "trudge through all four of the factors."'"  AT&T, 967 F.2d at 866-67 (citations omitted) (alteration in original).

## 1.  Is NJDEPE an especial beneficiary of the statute?

We first inquire as to whether NJDEPE is "`one of the class for whose especial benefit the statute was enacted,' --that is, does the statute create a federal right in favor of" NJDEPE? Cort, 422 U.S. at 78 (citation omitted).  The Supreme Court has explained that "benefit to certain parties is, by itself,

---

[0]This test applies to states as well as private parties seeking implied rights of action.  In FMC Corp, we applied Cort to a claim by the federal government that it had a right of action under a federal patent law.  We stated, "Separation-of-powers concerns apply with equal weight whether the enforcing party is a private litigant or the United States.  In either case, the central problem is the same:  did Congress intend to authorize a right of action about which the statute is silent?" FMC Corp., 717 F.2d at 780.  That logic has equal force here --it is Congress which must determine whether any particular party, be it state, federal government, or private person, has a right of action under a federal statute.

irrelevant:  `[t]he question is not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries.'"  FMC Corp., 717 F.2d at 781 (quoting California v. Sierra Club, 451 U.S. at 294).  We look to the statute itself for language explicitly conferring a right on the plaintiff's class for indication Congress intended the plaintiff to have a right of action.  If we find the statute merely "imposes a duty without an `unmistakable focus' on the benefitted class, [we] are reluctant to infer a remedy."  AT&T, 967 F.2d at 867 (quoting FMC, 717 F.2d at 781).

As in California v. Sierra Club and FMC, we have a statute which benefits the enforcing party, NJDEPE, but does not confer federal rights that NJDEPE may assert against the private defendants.  In the CZMA, Congress alluded to "a national interest in the effective management, beneficial use, protection, and development of the coastal zone," 16 U.S.C. § 1451(a), and found the key to promoting that interest to be "to encourage the states to exercise their full authority over the lands and waters in the coastal zone," id. § 1451(i).  The CZMA therefore provides for federal assistance in states' development of coastal zone management plans, and coordinates federal activities with the state management program.  The states may benefit through enhanced authority and healthier coastal zones, but this is to serve the ultimate goal of protecting the nation's coastal zones.  This benefit does not translate into "a right in favor" of the state that it can enforce against PECo and LIPa.

46

In the "Coordination and cooperation" provision at issue, 16 U.S.C. § 1456, the absence of rights-conferring language is marked. Duties are placed on applicants for federal licenses: the provision requires "any applicant for a required Federal license or permit to conduct an activity" affecting a state's coastal zone to submit a consistency certification to the federal agency, and to give a copy to the state. Id. §1456(c)(3)(A). Duties are also placed on federal agencies:

> No license or permit shall be granted by the Federal agency until the state or its designated agency has concurred with the applicant's certification or until, by the state's failure to act, the concurrence is conclusively presumed, unless the Secretary [of Commerce], on his own initiative or upon appeal by the applicant, finds, after providing a reasonable opportunity for detailed comments from the Federal agency involved and from the state, that the activity is consistent with the objectives of this chapter or is otherwise necessary in the interest of national security.

Id. These duties are not articulated in terms of rights of the state,[0] and there is no indication elsewhere of any right of the state to enforce the duties. Indeed, the federal government maintains control of the process from beginning to end: the Secretary of Commerce must approve the state's coastal zone

---

[0] As we have previously noted, Cort cited Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971), as an example of an implied right of action found to be based on a clear articulation of a federal right in favor of the plaintiff. The Bivens right was based on the Fourth Amendment, which guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amendment IV (emphasis added). See Cort, 422 U.S. at 82; AT&T, 967 F.2d at 870. The language of the CZMA makes no such mention of rights.

47

management program, which is the basis of consistency review, <u>id.</u> § 1455(d), and decides whether an application may be granted despite a state's claim that it is not consistent with the management program, <u>id.</u> § 1456(c)(3)(A). The language of this statute thus "focuses on the class of persons on whom a duty is imposed . . . and not on a class of intended beneficiaries," and does not establish the state as the especial beneficiary. <u>FMC Corp.</u>, 717 F.2d at 783.

Where a statute provides neither an explicit right of action for a particular party, nor clearly articulates a federal right in that party, a right of action may only be implied where there is a "`pervasive legislative scheme governing the relationship between the plaintiff class and the defendant class in a particular regard.'" <u>AT&T</u>, 967 F.2d at 870 (quoting <u>Cort</u>, 422 U.S. at 82). The CZMA is not such a scheme. While it certainly affects the relationship between the state and private parties applying for federal licenses, much of that relationship is determined by other state and federal law. Furthermore, if the CZMA is a "pervasive legislative scheme" at all, it is one governing the relationship between state and federal authorities with regard to coastal management.

### 2. Was there legislative intent to create the requested remedy?

Having found the language of the CZMA does not make the states especial beneficiaries for purposes of implied rights of action, we next look for "any indication of legislative intent,

explicit or implicit, either to create [the requested] remedy or to deny [it]." Cort, 422 U.S. at 78. The legislative history accords with the language of the statute, indicating no intent to create this right of action.

NJDEPE cites to one statement from a Senate report that shows the states were seen as integral to the coastal management scheme being established in the CZMA:

> [The CZMA] has as its main purpose the encouragement and assistance of States in preparing and implementing management programs to preserve, protect, develop and whenever possible restore the resources of the coastal zone of the United States. . . . There is no attempt to diminish state authority through federal preemption. The intent of this legislation is to enhance state authority by encouraging and assisting the states to assume planning and regulatory powers over their Coastal zones.

S. Rep. No. 753, 92nd Cong., 2d Sess., reprinted in 1972 U.S.C.C.A.N. 4776. Federal support to the states serves the overarching purpose of the statute, which is to promote better management of the nation's coast: "The [Commerce] Committee has adopted the States as the focal point for developing comprehensive plans and implementation management programs for the coastal zone." Id. at 4780. But, these statements of purposes and goals do not represent an open-ended grant of enforcement authority to the states. Rather, the statute "assist[s] and encourage[s]" the states through explicit measures, such as grants for development and administration of coastal management programs, 16 U.S.C. §§ 1454-55, and the consistency certification process, id. § 1456. A general

49

statement of intent to enhance state authority, given effect through explicit measures in the statute itself, cannot be taken to indicate an intent also to create rights of actions that the statute fails to mention.  It may be fairly said that "the legislative history . . . is entirely silent on the question whether a [state] right of action [against private parties] should or should not be available."  Touche Ross & Co. v. Redington, 442 U.S. 560, 571 (1979).  Where, as we have found, "the plain language of the provision weighs against implication of [the requested] remedy, the fact that there is no suggestion whatsoever in the legislative history that [§ 1456] may give rise to suits [against private applicants for federal licenses] reinforces our decision not to find such a right of action implicit within the section."  Id.

### 3. Conclusion

Because we find the states are not especial beneficiaries of the CZMA by its language, and no indication of legislative intent to create a cause of action in favor of states against private parties, we need not "trudge through" the remaining two Cort factors. Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 388 (1982)). "The question whether Congress, either expressly or by implication, intended to create a [state] right of action [against private parties], has been definitively answered in the negative." Touche Ross & Co., 442 U.S. at 576. NJDEPE's complaint against LIPA and PECo under the CZMA must therefore be dismissed for failure to state a claim.

### V.

NJDEPE's motion for injunctive relief was properly denied by the district court. A movant for preliminary injunction must show:

> that irreparable injury will occur if relief is not granted to maintain the status quo until a final adjudication on the merits can be made and that there is a reasonable probability of eventual success on the merits. In addition, the court must weigh the possibility of harm to the nonmoving party as well as to any other interested persons and, when relevant, harm to the public.

Continental Group, Inc. v. Amoco Chem. Corp., 614 F.2d 351, 356–57 (3d Cir. 1980). Because we find that NJDEPE must fail on the merits of its case, no injunction can issue.

As we have discussed, NJDEPE had several avenues to present its claims other than as a request for an injunction. It

51

could have petitioned for rescission of the NRC regulation it objected to, 10 C.F.R. § 2.802(a), for an exception to the application of that rule here, id. § 2.758(b), or for a modification or suspension of PECo's license that allowed transportation of the fuel, id. § 2.206. Some of these options are still viable.

## VI.

For the reasons stated, we will affirm the district court's dismissal of NJDEPE's claim against the NRC under NEPA, and its grant of summary judgment to the Coast Guard on the CZMA claim. We will also instruct the district court to dismiss NJDEPE's claim against the NRC, PECo, and LIPA under the CZMA.