COASTAL HABITAT ALLIANCE,
Plaintiff,

v.

Jerry PATTERSON, In his Official Capacity as Commissioner of the Texas General Land Office; Chairman Barry Smitherman, Julie Carruthers Parsley, and Paul Hudson, In their Capacities as Commissioners of the Texas Public Utility Commission; Texas Gulf Wind, LLC, Wholly Owned by Babcock & Brown Renewable Holdings, LLC; and Iberdrola Renewables, Inc.,[1] Defendants.

Cause No. A–07–CA–985–LY.

United States District Court,
W.D. Texas,
Austin Division.

Sept. 30, 2008.

As Amended May 22, 2009.

---

1. Defendant Iberdrola Renewables, Inc. is the Defendant formerly known as PPM Energy, Inc.

Charles W. Irvine, James B. Blackburn, Jr., Mary W. Carter, Blackburn Carter, P.C., David A. Kahne, Law Office of David A. Kahne, Houston, TX, for Plaintiff.

Frank A. King, Attorney General of Texas, Shelley Dahlberg, Office of the Attorney General, Austin, TX, for Jerry Patterson.

Douglas B. Fraser, Nathan Myrick Bigbee, Attorney General's Office, Austin, TX, for Barry Smitherman, Julie Carruthers Parsley, Paul Hudson.

Christopher Hughes, Marianne Carroll, Rachel Lynn Noffke, Thomas H. Watkins, Brown McCarroll LLP, Virginia Katherine Hoelscher, Office of the Attorney General of Texas, Opinion Committee, Austin, TX, for Texas Gulf Wind, LLC.

Allison L. Bowers, David Savage, Sara M. Burgin, Stacy Rogers Sharp, Baker Botts LLP, Austin, TX, James H. Barkley, William Karl Kroger, Baker Botts LLP, Houston, TX, for PPM Energy, Inc.

## *AMENDED MEMORANDUM OPINION AND ORDER GRANTING MOTIONS TO DISMISS*

LEE YEAKEL, District Judge.

Before the Court are PUC Commissioners' Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) and Brief in Support filed December 21, 2007 (Clerk's Document 13), Texas Gulf Wind LLC and PPM Energy, Inc.'s Joint Motion to Dismiss and Supporting Brief filed December 26, 2007 (Clerk's Document 16), Commissioner Patterson's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) and Brief in Support filed January 11, 2008 (Clerk's Document 23), Plaintiff's Consolidated Response to Defendants' Motions to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) filed January 23, 2008 (Clerk's Document 27), Commissioner Patterson's Reply Brief in Support of his Motion to Dismiss filed February 4, 2008 (Clerk's Document 34), PUC Commissioners' Reply to CHA's Response to Motions to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) filed February 4, 2008 (Clerk's Document 35), Texas Gulf Wind LLC and PPM Energy, Inc.'s Joint Reply in Support of their Motion to Dismiss filed February 4, 2008 (Clerk's Document 36), Plaintiff's Consolidated Sur–Reply to Defendants' Motions to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) filed March 3, 2008 (Clerk's Document 44), and Texas Gulf Wind LLC's Supplemental Brief on the Motion to Dismiss filed May 27, 2008 (Clerk's Document 70). The Court conducted a hearing on the motions to dismiss on June 3, 2008. Having considered the motions and related documents, the arguments of counsel, the record in this cause, and the applicable law, the Court will grant the motions to dismiss because the Court finds Coastal Habitat Alliance ("Alliance") lacks standing to bring its claims against Defendants.

### I. Background and Statutory Scheme [2]

Defendants Texas Gulf Wind, LLC and Iberdrola Renewables, Inc. (collectively, the "Private Defendants") are building wind-energy-generation facilities ("wind farms") in Kenedy County, Texas, on land adjoining the Laguna Madre.[3] The area encompasses biologically diverse expanses of undeveloped land through which three major migratory-bird pathways converge. Plaintiff Coastal Habitat Alliance states it

---

**2.** In considering the motions to dismiss, the Court accepts as true all facts alleged in Plaintiff Coastal Habitat Alliance's First Amended Complaint. *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 n. 1, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

**3.** Kenedy County is located on the Gulf of Mexico coast, in far south Texas. The Laguna

Madre is a long, shallow bay, which in Texas extends from Corpus Christi on the north to Port Isabel on the south, and continues southward along the Mexican coast. It is bounded on the east by Padre Island and on the west by the Texas mainland.

is an alliance of area ranchers and organizations dedicated to protecting the Laguna Madre and its associated environmental resources.[4] Coastal Habitat Alliance filed suit against the Private Defendants; Jerry Patterson, in his capacity as Commissioner of the Texas General Land Office; and Chairman Barry Smitherman, Julie Carruthers Parsley, and Paul Hudson in their capacities as Commissioners of the Texas Public Utility Commission ("Commission") (collectively, "State Defendants"). The Alliance alleges it has been deprived of its rights under the Coastal Zone Management Act ("Act") and the Texas Coastal Management Program ("Texas Program" or "Program"), in violation of the United States Constitution's Supremacy Clause and the Due Process Clauses of the Fifth and Fourteenth Amendments. *See* U.S. Const. art. VI, cl. 2; amends. V, XIV, § 1; 42 U.S.C. § 1983 ("Section 1983"). The Alliance seeks declaratory and injunctive relief and attorney's fees. *See* 28 U.S.C. §§ 2201, 2202; 42 U.S.C. § 1988.

Congress enacted the Coastal Zone Management Act in 1972 after finding a need to improve management of the nation's coastal zones. 16 U.S.C. § 1451 *et seq.* The Act encourages states to exercise their full authority over land and water in their coastal zones by offering the states financial and technical assistance to develop coastal-zone-land-and-water-use programs. *Id.* § 1451(i); § 1455(a), (c); §§ 1455a–1456b (financial assistance); § 1455a(f); § 1455b(b)(4), (d) (technical assistance). A state can avail itself of the Act's opportunities by developing a management program approved by the Secretary of Commerce ("Secretary"). *Id.* §§ 1454–1455. Before approving a state's management program, the Secretary must find the state's program was developed and adopted in accordance with Act requirements. *Id.* § 1455(d)(1). The Secretary must find the program contains Act-required elements, including, *inter alia,* "a planning process for energy facilities likely to be located in, or which may significantly affect, the coastal zone, including a process for anticipating the management of the impacts resulting from such facilities." *Id.* § 1455(d)(2)(H). The Secretary may make financial grants to a coastal state only if the Secretary finds the state has created a management program that meets Act requirements. *Id.* § 1455(a)-(b).

A requirement for entry into this federal-state partnership is that a state, acting through its chosen agency or agencies, has authority for the management of the state's coastal zone in accordance with its management program. *Id.* § 1455(d)(10); 15 C.F.R. §§ 923.41–.44 (2008). The management program must include provisions to ensure appropriate protection of significant resources, such as wetlands. 15 C.F.R. § 923.3(b). Specifically, the state program must include a planning process for energy facilities located in, or which may significantly affect, the state's coastal zone. 16 U.S.C. § 1455(d)(2)(H). Energy facilities include electric-generating plants. *Id.* § 1453(6).

A state may use any of three techniques to control land and water uses in its coastal zone: (1) state establishment of criteria and standards for local implementation, (2) direct state land and water-use planning and regulation, or (3) state administrative review for consistency with the state's management program of all projects proposed by entities, including private developers, with power to approve or disapprove after public notice and opportunity for hearing.[5] *Id.* § 1455(d)(11)(A)-(C).

---

**4.** Coastal Habitat Alliance's members are the Audubon Outdoor Club of Corpus Christi, Coastal Bend Audubon Society, Frontera Audubon Society, Galveston Bay Conservation and Preservation Association, Houston Audubon Society, King Ranch, Inc., Lower Laguna Madre Foundation, and Matagorda Bay Foundation.

**5.** Texas's coastal-management program follows the third option—state administrative review for consistency with the state's management program. The Court will refer to such review as "consistency review." *See e.g.* Tex. Nat. Res.Code Ann. §§ 33.2053(b), .205.

The state program must provide for public participation in permitting processes, consistency review, and other similar decisions. *Id.* § 1455(d)(14). For energy facilities, a state's program must provide procedures for assessing the suitability of sites and identification of how interested and affected parties will be involved in the planning process. 15 C.F.R. § 923.13(a)-(d).

Texas proposed a coastal-management program to the Secretary in 1995. The Office of Ocean and Coastal Resource Management, within the National Oceanic and Atmospheric Administration of the Department of Commerce, reviewed Texas's proposed program and prepared the Texas Program documents.[6] *See* Office of Ocean and Coastal Resource Management, National Oceanic and Atmospheric Administration, Department of Commerce & Coastal Coordination Council, State of Texas, Final Environmental Impact Statement, at iii (August 1996) ("Texas CMP FEIS") ("It is the general policy of the Federal Office of Ocean and Coastal Resource Management (OCRM) to issue combined environmental impact statements and program documents.").

The Texas Program designates the General Land Office as its lead agency. Texas CMP FEIS, Part II, at 3–5; *see* 16 U.S.C. § 1455(d)(6); 15 C.F.R. § 923.47. The Program is networked to combine the expertise and resources of eight state agencies, eighteen local governments, and the Coastal Coordination Council. Texas CMP FEIS, Part I, at 4; *see generally* 16 U.S.C. § 1455(d)(11)(C). The Coastal Coordina-

tion Council consists of the heads of Texas's resource agencies and four gubernatorial appointees and is responsible for, *inter alia,* "program oversight and dispute resolution through the state consistency review procedures . . . ," and monitoring Program agencies to assure their compliance with the Program. Texas CMP FEIS, Part I, at 6; Part II, at 3–7. The General Land Office's Coastal Division staffs the Coastal Coordination Council and coordinates implementation of the energy-facility siting plan. *Id.,* Part II, at 3–5 to 3–6.

The Texas Program provides a framework for ensuring that new electric-generating facilities do not harm the environment. First, the Texas Program establishes policies for managing the siting, construction, and maintenance of electric-generating facilities and electric-transmission lines. *Id.* at 1–7. The Program includes an "enforceable policy" of siting new electric-generating facilities at previously developed sites. *Id.,* Part II, at 4–6; 31 Tex. Admin. Code Ann. § 501.16(1). Enforceable policies are "[s]tate policies which are legally binding through constitutional provisions, laws, regulations, land use plans, ordinances, or judicial or administrative decisions. . . ." 16 U.S.C. § 1453(6a). In siting facilities at undeveloped sites, the Texas Program policy is to avoid construction in critical areas and to locate facilities at sites selected to have the least adverse effects practicable on areas used for "spawning, nesting, and seasonal migrations of

6. In reviewing and approving the Texas Program, the Office of Ocean and Coastal Resources Management prepared a Final Environmental Impact Statement ("Final Statement") pursuant to the National Environmental Policy Act. Throughout this litigation, the parties have referred to the Program documents contained in the Final Statement, and the Court does the same.

In its First Amended Complaint, Coastal Habitat Alliance states the Texas Program received final approval in December 1996, but at the motion-to-dismiss hearing, Defendants stated final approval occurred in 1997. The parties have not asserted, however, that the exact month and year of final Program approval are important to the Court's resolution of this case.

terrestrial and aquatic fish and wildlife species." Texas CMP FEIS, Part II, at 4–6; 31 Tex. Admin. Code Ann. § 501.16. "Critical areas" include coastal wetlands. 31 Tex. Admin. Code Ann. § 501.3(a)(8). "Adverse effects" occur when an effect results in the physical destruction or detrimental alteration of a coastal zone. 31 Tex. Admin. Code Ann. § 501.3(a)(1). Adverse effects include alterations that harm the coastal zone as a habitat for terrestrial and aquatic life, that disrupt wildlife corridors or fish or migratory bird routes, and that alter water in ways that are harmful to terrestrial or aquatic life. *Id.* § 501.3(a)(1)(D)-(E), (H).

The Texas Program requires that the Public Utility Commission comply with the Program's energy-siting policies when issuing Certificates of Convenience and Necessity ("Certificates") to new electric-generating facilities. Texas CMP FEIS, Part II, at 4–6 (citing Public Utility Regulatory Act(PURA), 64th Leg., R.S., ch. 721, sec. 50(1), 1975 Tex. Gen. Laws 2327, 2345 (requiring public utility to obtain certificate of convenience and necessity));[7] *see* 16 U.S.C. § 1455(d)(10). A public utility may not render services without "having obtained from the [C]ommission a [C]ertificate that the present or future public convenience and necessity requires or will require" such service. PURA, 64th Leg., R.S., ch. 721, sec. 50(1), 1975 Tex. Gen. Laws 2327, 2345. The Commission performs consistency review when issuing a Certificate. Act of May, 19, 1995, 74th Leg., R.S., ch. 416, § 4, sec. 33.2053(b), 1995 Tex. Gen. Laws 3017, 3025 (codified at Tex. Nat. Res.Code Ann. § 33.2053(b)). The Commission must affirm in writing that the Certificate is consistent with Program goals and policies. Act of May 21, 1991, 72nd Leg., R.S., ch. 295, § 37, sec. 33.205(b), 1991 Tex. Gen. Laws 1220, 1233, *amended by* Act of May 19, 1995, 74th Leg., R.S., ch. 416, § 4, sec. 33.205(b), 1995 Tex. Gen. Laws 3017, 3023 (current version at Tex. Nat. Res.Code Ann. § 33.205). Any person interested in a public utility's application for a Certificate may intervene at a hearing on such Certificate. PURA, 64th Leg., R.S., ch. 721, sec. 54(a), 1975 Tex. Gen. Laws 2327, 2346.

The Coastal Coordination Council ensures that interested and affected parties are involved in the planning process for siting energy facilities through *inter alia*, "publish[ing] notice in the *Texas Register* . . ." of "consistency determinations and other program decisions." This in addition to "the public participation prescribed by the permitting procedures of individual agencies." Texas CMP FEIS, Part II, at 8–5; *see* 15 C.F.R. § 923.13(d). Citizens may challenge the result of the Commission's consistency review in a contested-case hearing before an agency, and may seek judicial review of the Commission's decision as provided by law. *See* Texas CMP FEIS, Part II, at 3–9.

In summary, the Texas Program prioritizes siting electric-generating facilities at developed sites and in areas where the facilities will cause the least environmental damage. Texas CMP, Part II, at 4–6; Tex. Admin. Code. Ann. § 501.16. Citizens who desire to participate in assuring the General Land Office, Public Utility Commission, and other state agencies implement the Program's environmental-protection policies will receive notice of a decision as to a project's consistency with such policies through the *Texas Register,* and may raise issues at a Certificate hearing. Citizens may challenge such de-

---

**7.** The Texas Program cites such authority as "Tex.Rev.Civ. Stat. Ann., art. 1446c." For ease of discussion, in the text of this Order, the Court refers to the Commission's Certificate-issuing authority as "Article 1446c."

termination in a contested case, and seek judicial review of the decision.

The parties agree that this case arises because when the Texas Legislature deregulated the utility industry, it eliminated the statutory requirement that many electric-generating facilities obtain a Certificate.[8] In doing so, the legislature eliminated the process through which the Public Utility Commission conducted consistency review.[9] In 1995, the legislature narrowed the definition of "public utility" to exclude "exempt wholesale generators," among other types of entities.[10] Act of May 27, 1995, 74th Leg., R.S., ch. 765, § 2.01, sec. 2.0011, 1995 Tex. Gen. Laws 3972, 3989, *current version* at Tex. Util. Code Ann. § 31.002(6). Current law requires electric utilities to obtain a Certificate, but the narrow definition of "electric utility" effectively means few electric-generating facilities must obtain one. *See* Tex. Util.Code Ann. § 37.051(a). Defendants argue the Private Defendants' wind farms are exempt wholesale generators and have been excluded from the definition of electric utilities and the Certificate requirement since September 1, 1995. Defendants argue these wind farms were therefore never subject to Texas Program because even before Program approval they would not have been required to obtain a Certificate.

The Court finds that because the Texas Program cites Article 1446c as the authority under which the Public Utility Commission shall issue Certificates and conduct consistency review, Article 1446c's definition of "public utility" applies in this case. A public utility is "any . . . corporation . . . now or hereafter owning or operating for compensation in this state equipment or facilities for: (1) producing, generating, transmitting, distributing, selling, or furnishing electricity . . . ," and includes the wind farms. Act of May 19, 1993, 73rd Leg., R.S., ch. 350, § 1, sec. 3(c), 1993 Tex. Gen. Laws 1560, 1560. The wind farms are therefore subject to the Texas Program's requirements. Such requirements include obtaining a Certificate, because "no public utility may in any way render service directly or indirectly to the public under any franchise or permit without first having obtained from the [C]ommission a[Ce]rtificate that the present or future public convenience and necessity require or will require such installation, operation, or extension." PURA, 64th Leg., R.S., ch. 721, sec. 50(1), 1975 Tex. Gen. Laws 2327, 2345.

Coastal Habitat Alliance argues that Texas lacked the unilateral authority to eliminate consistency review. To obtain approval for such an elimination, Texas should have engaged in a statutorily pre-

---

8. In the late 1990s, PURA underwent simultaneous substantive and nonsubstantive revisions. Nonsubstantive revisions include a 1995 renumbering; PURA moved from article 1446c to article 1446c–0. Public Utility Regulatory Act of 1995, 74th Leg., R.S., ch. 9, 1995 Tex. Gen. Laws 31. Additionally, the legislature codified Texas utility law in 1997. Act of May 8, 1997, 75th Leg., R.S., ch. 166, 1997 Tex. Gen. Laws 713. The Court discusses relevant substantive revisions in the body of this Order.

9. The parties frequently mention that deregulation occurred in 1999. *See generally* Act of May 27, 1999, 76th Leg., R.S., ch. 405, 1999

Tex. Gen. Laws 2543. Although the bulk of deregulation occurred in 1999, the only Certificate-related change in 1999 omitted the requirement that "electric cooperatives" obtain a Certificate. *See id.* § 30, sec. 37.051(c), at 2555. No party argues the wind farms are electric cooperatives.

10. The 1997 PURA codification replaced the term "public utility" with "electric utility." Act of May 8 1997, 75th Leg., R.S., ch. 166, § 1, sec. 11.004, sec. 31.002(1), 1997 Tex. Gen. Laws, 713, 717, 744–45. For purposes of this discussion, there is no significance to the difference between the terms "public utility" and "electric utility."

scribed process for making the change, which would have involved public participation. 16 U.S.C. § 1455(e)(1), (3). Amendments that affect authorities and public involvement are considered substantial changes. 15 C.F.R. § 923.80(d). The state must conduct at least one public hearing on proposed amendments to a management plan and the amendment request must document the opportunities of the public and private parties to participate in development and approval of the proposed amendment. *Id.* § 923.81(a), (b)(5).

The National Oceanic and Atmospheric Administration's Office of Ocean and Coastal Resource Management reviews a state's amendment request to determine whether the program, including the proposed amendment, still constitutes an approvable program. *Id.* § 923.81(a). If the Office determines that the amended program is approvable, it then determines whether the amended program requires an environmental impact statement pursuant to the National Environmental Policy Act. *Id.* § 923.81(c). Routine program changes that do not result in substantial changes are not subject to the described amendment procedures, but the public must still be notified of the proposed routine changes. *Id.* § 923.84(a), (b)(2), (b)(4).

Coastal Habitat Alliance alleges Texas never attempted to amend its Program after deleting the statutory requirement that many electric-generating facilities obtain a Certificate. The Alliance states Texas submitted proposed Program changes to the federal government on July 11, 2006, which it called routine program changes, which did not disclose the elimination of Certificate review. *See id.* §§ 923.84(a), .80(d). The Alliance alleges the federal government never received notice that consistency review for projects like the wind farms had been omitted from Texas law.

Coastal Habitat Alliance alleges no environmental review has been conducted for the wind farms. The Alliance further alleges the wind farms have been under development for many years and that it has asked the State Defendants to assure consistency review, but they have refused, citing the statutory repeal of the Public Utility Commission's Certificate requirements as the reason they cannot conduct consistency review of these wind farms. The Alliance alleges that groups opposed to these wind farms and other members of the Coastal Coordination Council have repeatedly alerted General Land Office Commissioner Patterson that repeal of Public Utility Commission Certificate review for electricity-generating facilities in the coastal zone would eliminate meaningful review of the environmental consequences of siting such wind farms in the coastal zone. The Alliance alleges it has been denied a meaningful opportunity to raise concerns about the environmental implications of the wind farms.

By this action, Coastal Habitat Alliance seeks declarations that the Private Defendants may not build the wind farms before consistency review is conducted pursuant to the Coastal Zone Management Act and Texas Program, and that during such consistency review the State Defendants must allow the Alliance an opportunity to be heard and an opportunity for judicial review. The Alliance also seeks an injunction prohibiting Private Defendants from building the wind farms in the coastal zone until and unless consistency review occurs with participation by the Alliance. The Alliance finally seeks costs and attorney's fees.

All Defendants have filed motions to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (b)(6), arguing that Coastal Habitat Alliance lacks standing to bring its claims and has failed to state

claims on which relief can be granted. The motions are ripe for ruling by this Court.

## II. Analysis

### A. *The Parties' Claims and Arguments*

#### 1. *Coastal Habitat Alliance*

Coastal Habitat Alliance alleges two causes of action against Defendants. First, the Alliance alleges Defendants' course of action in not conducting consistency review and in not properly amending the Texas Program is preempted by the Coastal Zone Management Act and the Texas Program ("preemption claim").[11] The Alliance relies on *Planned Parenthood of Houston v. Sanchez* for the proposition that a party may bring an action for declaratory and injunctive relief based on preemption. 403 F.3d 324, 331 (5th Cir. 2005). The Alliance argues Texas is "bound by the strings" accompanying the federal funds it has accepted. *Id.* at 337. The Alliance argues Congress clearly intended environmental review and public participation to occur in implementation of the Act, and Texas's failure to follow through with those elements of its Program render its actions in conflict with federal law. The Alliance further argues that its right to participate in any proceeding regarding a Certificate, or any other proceeding in which it could obtain environmental and consistency review under the Act, is a constitutionally protected property interest that Defendants have taken without due process of law ("Due Process claim").

#### 2. *Defendants' Arguments*

#### a. *Standing*

Defendants argue Coastal Habitat Alliance lacks standing to pursue its claims against them. Specifically, they argue the Alliance has not alleged a cognizable injury because the Act does not create a private right of action, and Defendants' actions therefore invade no legally protected interest of the Alliance. *See Day v. Bond,* 500 F.3d 1127, 1139 (10th Cir.2007). Defendants additionally argue that the Alliance cannot demonstrate causation sufficient for standing because no act of Defendants caused the Alliance's injury; instead, any injury suffered by the Alliance was caused by the legislature's deregulation of the utility industry. Finally, Defendants argue the Alliance cannot demonstrate redressability on its preemption claim because the Alliance is unable to show how nullification of a state statute would redress its alleged injuries. *See Equal Access for El Paso v. Hawkins,* 428 F.Supp.2d 585, 593, 608 (W.D.Tex.2006).

#### b. *Substantive Arguments*

The Defendants argue the Court must dismiss this action for failure to state a claim because the Coastal Zone Management Act does not create a private right of action. *See e.g. George v. NYC Dept. of City Planning,* 436 F.3d 102 (2d Cir.2006); *New Jersey Dept. of Envtl. Protection v. Long Island Power Auth.,* 30 F.3d 403 (3d Cir.1994) (*Long Island Power Auth.*). Coastal Habitat Alliance responds it is not relying on an Act-created right of action; instead it asserts the Act and the Texas Program preempt Texas's action contrary to such law.

In response to the Alliance's preemption contention, the Private Defendants argue that the Alliance's preemption claim against them must be dismissed because a preemption claim cannot lie against pri-

---

**11.** Although Coastal Habitat Alliance's procedural injury encompasses both deprivation of consistency review and Texas's failure to properly amend its Program with public participation, for purposes of this discussion, the Court considers the latter injury to be subsumed in the injury "deprivation of consistency review."

vate actors. The State Defendants argue the preemption claim must be dismissed because no state law exists to be preempted, to which the Alliance responds that the preempted state statute is the statute which eliminated consistency review for energy-generating facilities in the coastal zone. Defendants further argue that under *Gonzaga v. Doe* and *Hawkins,* an action brought under Section 1983 must be based on a statute that creates a private right of action. *See* 536 U.S. 273, 284, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002); *Hawkins,* 428 F.Supp.2d at 623. The Alliance responds that *Planned Parenthood* expressly distinguished *Gonzaga* and held that a plaintiff can properly plead a preemption claim, even if a Section 1983 action would not be proper. *Planned Parenthood,* 403 F.3d at 335. Finally, Defendants argue the Court must dismiss the Alliance's procedural Due Process claim because the Coastal Zone Management Act does not confer protected rights on the Alliance.

The Court begins its analysis, as it must, by inquiring whether Coastal Habitat Alliance has standing to bring its claims against Defendants. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 93–102, 118 S.Ct. 1003, 140 L.Ed.2d 210(1998). Because the Court holds the Alliance does not have standing, it does not address Defendants' substantive arguments.

### B. *Standing Generally*

Standing is "built on a single basic idea—the idea of separation of powers." *Allen v. Wright,* 468 U.S. 737, 752, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984). Standing is an essential part of the case-or-controversy requirement of Article III of the Constitution. *See* U.S. Const. art. III, sec. 2; *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As such, the standing inquiry addresses whether a plaintiff's claims are appropriately resolved by the court.

*Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Standing implicates the court's jurisdiction and must be addressed before determining whether the plaintiff has adequately stated claims against defendants. *See Steel Co.,* 523 U.S. at 93–102, 118 S.Ct. 1003; *Ramming v. United States,* 281 F.3d 158, 161 (5th Cir.2001)("When a Rule 12(b)(1) motion is filed in conjunction with other Rule 12 motions, the court should consider the Rule 12(b)(1) jurisdictional attack before addressing any attack on the merits. This requirement prevents a court without jurisdiction from prematurely dismissing a case with prejudice."). At the pleading stage of proceedings, the plaintiff need only make general factual allegations of injury caused by defendants. *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130. The court must assess the plaintiff's standing to bring each of its claims against each defendant. *See James v. City of Dallas,* 254 F.3d 551, 563 (5th Cir.2001).

The familiar "irreducible constitutional minimum of standing" requires first that the plaintiff have suffered an injury in fact, that is, an actual or imminent invasion of a concrete and particularized legally protected interest. *Lujan,* 504 U.S. at 560, 112 S.Ct. 2130. Second, there must be a causal connection between the plaintiff's complained-of injury and the defendants' actions. *Id.* Third, it must be likely that the plaintiff's injury will be redressed by a favorable decision from the court. *Id.* at 561, 112 S.Ct. 2130. To seek injunctive relief, a plaintiff must also allege defendants will cause it future injury and that the relief sought will redress such injury. *James,* 254 F.3d at 563. Further, an organization must demonstrate associational standing. An organization has standing to bring suit on its members' behalf when its members would otherwise have standing, it seeks to protect interests germane to the organization's purpose, and

neither the claims asserted nor relief sought requires participation in the lawsuit by individual members of the organization.[12] *Hunt v. Washington Apple Advert. Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977); *Friends of the Earth, Inc. v. Chevron Chemical Co.,* 129 F.3d 826, 827–28 (5th Cir.1997).

Coastal Habitat Alliance alleges two injuries in its First Amended Complaint to support its standing to bring this lawsuit against Defendants. The Alliance's first alleged injury is the environmental harm the wind farms will allegedly cause to the fragile wetlands and dependant wildlife in the Laguna Madre area ("environmental harm"). "Construction, operation, and maintenance of these wind farms will harm Alliance members' economic, environmental, and recreational interests uniquely entwined with the endangered and threatened species, Laguna Madre and surrounding wetlands, as well as migratory birds and animals living in, traveling through, and otherwise using 'the last great habitat.'" The Alliance's second alleged injury is deprivation of the consistency review through which it alleges it should have been able to educate state officials and the public of the dangers of locating the wind farms in such a vulnerable area ("deprivation of consistency review"). The "Alliance and its members have been denied any opportunity to participate in any proceeding regarding a [Certificate], or any other proceeding in which to obtain environmental review and to assure consistency with [the] Texas [Program] regarding the challenged wind farms."

Although the Alliance alleges both the injury of environmental harm and the injury of deprivation of consistency review, the Alliance does not expressly assign each type of injury to a type of Defendant. The Alliance alleges the Private Defendants' wind farms are causing environmental harm and the State Defendants' decisions are causing deprivation of consistency review, but it does not allege the State Defendants are causing environmental harm, nor does it allege the Private Defendants are causing the State Defendants' failure to conduct consistency review, besides approving of the lack of regulation.[13] Thus, for purpose of standing, the Court evaluates whether the Alliance has standing to pursue its claims against the Private Defendants for the injury of environmental harm, and whether the Alliance has standing to pursue its claims against the State Defendants for the injury of deprivation of consistency review. The Court analyzes the Alliance's standing to bring both its preemption and Due Process claims. The Court concludes the Alliance lacks stand-

12. Practically, whether Coastal Habitat Alliance's members would have standing to sue in their own right overlaps the standard standing test. The Court's standing analysis is intended to address both whether the Alliance's members would have standing in their own right and whether the Alliance has standing to bring suit on its members' behalf. Because the Court decides the Alliance's members would not have standing to sue, it does not decide whether the Alliance meets the other prongs of the associational-standing test.

13. The pleadings might also be read to allege the conjoined injury of environmental harm in the absence of consistency review. Arguably, this injury is caused by Defendants collectively, and would be redressed by the relief the Alliance seeks. However, a corollary to this proposition is that the Alliance would not suffer injury from environmental harm caused by wind farms that had undergone consistency review and been found consistent with the Act and Texas Program. If the environmental-harm aspect of the conjoined injury ends up being irrelevant, then such articulation of injury is simply another way of saying the Alliance has been injured by deprivation of consistency review. The Court will therefore not consider the Alliance's injury jointly.

ing to bring its preemption claim against the State Defendants because the injury of deprivation of consistency review is not sufficiently concrete or particularized. Further, the Alliance lacks standing to pursue its Due Process claim against the State Defendants and preemption and Due Process claims against the Private Defendants, because the relief it seeks will not redress its alleged injuries.

## C. Injury: Coastal Habitat Alliance does not have standing to bring its preemption claim against the State Defendants for the injury of deprivation of consistency review.

■ To convey standing, an injury must be "particularized," meaning it must affect a plaintiff's members in a direct and individual way.[14] *Lujan,* 504 U.S. at 561, 112 S.Ct. 2130; *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434. Defendants argue that because the Act does not create a private right of action, Coastal Habitat Alliance has only alleged invasion of a procedural right, and its alleged injury is not concrete and particularized as required by the standing test. The Public Utility Commission Com-

missioners direct the Court to *Day v. Bond.* In *Day,* plaintiffs sued to prevent implementation of a Kansas state statute that deemed certain Kansas nonresidents residents for university-tuition purposes. 500 F.3d at 1130. The plaintiffs alleged the state statute was preempted by federal immigration law, and their only alleged injury was violation of the relevant federal statute. *Id.* at 1130, 1136. The court determined the federal statute did not confer a private right of action, and plaintiffs therefore had not alleged an invasion of a legally protected interest sufficient to confer standing to bring the preemption claim. *Id.* at 1139. The Commissioners argue the result in *Day* requires dismissal of the Alliance's preemption claim because the Coastal Zone Management Act does not create a private right of action. *See generally George,* 436 F.3d 102; *Long Island Power Auth.,* 30 F.3d 403.

■ Coastal Habitat Alliance responds that *Day* is distinguishable because the Alliance faces the injury of environmental harm in additions to violation of the Act. For purposes of its preemption claim

14. The following analysis applies only to the Alliance's preemption claim, not its Due Process claim. For purposes of its Due Process claim, the Alliance argues its right to consistency review is a constitutionally protected property interest. To have a property interest protected by the Fourteenth Amendment, the Alliance must have more than an abstract need or unilateral expectation of consistency review; it must have an entitlement. *See Board of Regents v. Roth,* 408 U.S. 564, 578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). An entitlement is created and its dimensions are defined by "rules or understandings that stem from an independent source ..." *Id.* Independent sources include "state statutes, local ordinances, existing rules, contractual provisions, [ ] mutually explicit understandings[,]" or federal law. *Blackburn v. City of Marshall,* 42 F.3d 925, 936–37, 937 n. 12 (5th Cir.1995). Although the Alliance's injury is based on the same State Defendant omissions whether the violated right hinges on the Act or the Consti-

tution, the entitlement test itself assures that injury to an entitlement would be concrete and would affect the Alliance's members in an individual way. *See Roth,* 408 U.S. at 578, 92 S.Ct. 2701. If consistency review is indeed an entitlement subject to constitutional protection, then by its Due Process claim, the Alliance has alleged injury to a more concrete and particularized legal interest than its more generalized interest in having the State Defendants follow the Act. Coastal Habitat Alliance's Due Process claim against the State Defendants is therefore distinguishable from claims in cases in which courts found plaintiffs lacked standing because their alleged injury was common to all. *See Lujan,* 504 U.S. at 574–576, 112 S.Ct. 2130 (discussing, among other cases, *Allen,* 468 U.S. at 754, 104 S.Ct. 3315; *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 483, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982); *Schlesinger v. Reserv-*

against the State Defendants, however, the only relevant injury is deprivation of consistency review, a violation of the Act. Under *Day's* reasoning, if the Act does not confer a private right of action on the Alliance, the Alliance has not alleged a concrete injury sufficient for standing purposes.

When a statute does not expressly create a private right of action, a court may only find an implied right of action in the statute if it is clear Congress intended such a result. *Alexander v. Sandoval,* 532 U.S. 275, 286, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001); *Long Island Power Auth.,* 30 F.3d at 421; *see generally Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). To determine whether Congress intended a statute to create a private right of action, the court analyzes the text and structure of the statute. *See Alexander,* 532 U.S. at 288, 121 S.Ct. 1511; *George,* 436 F.3d at 103. If the text "explicitly contemplates public enforcement only, courts will assume Congress intended to preclude private enforcement." *George,* 436 F.3d at 103. Additionally, when a statute does not provide an explicit or clearly articulated right of action in a party, a court may only imply such a right when the statute creates a pervasive legislative scheme governing rights between the plaintiff and

defendant classes. *Long Island Power Auth.,* 30 F.3d at 422.

No text of the Coastal Zone Management Act indicates Congress intended to confer a private right of action on private parties. *George,* 436 F.3d at 103; *see also* 16 U.S.C. § 1456; *Long Island Power Auth.,* 30 F.3d at 422. Similarly, the Act does not create a pervasive legislative scheme governing the relationship between plaintiffs like the Alliance and defendants like the State and Private Defendants in this case. *Long Island Power Auth.,* 30 F.3d at 422. The Court also notes the Alliance disclaims a private right of action under the Act. The Court holds that the Coastal Zone Management Act does not create a private right of action under which the Alliance may sue the Private and State Defendants.

The Alliance's preemption claim is therefore anchored by nothing more than its desire that the State Defendants follow the law, which, alone, is not an injury sufficient to confer standing. *Lujan,* 504 U.S. at 573–74, 112 S.Ct. 2130; *Allen,* 468 U.S. at 753, 104 S.Ct. 3315; *Day,* 500 F.3d at 1136; *Delta Commercial v. Gulf of Mexico Fishery Mgmt. Council,* 364 F.3d 269, 272–73 (5th Cir.2004) (holding plaintiff failed to show injury where alleged injury was deviation from statutory requirement).[15]

---

ists Comm. to Stop the War, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974)).

**15.** The Alliance also points out that *Lujan* alludes to special procedural rights. *See Lujan,* 504 U.S. at 571–572, n. 7, 112 S.Ct. 2130. In *Lujan,* the court of appeals had held plaintiffs suffered a procedural injury based on the citizen-suit provision of the Endangered Species Act. *Id.* at 571, 112 S.Ct. 2130. The relevant citizen-suit provision allowed "any person" to sue for violation of the Endangered Species Act. *Id.* at 571–72, 112 S.Ct. 2130. The *Lujan* majority held such procedural injury was insufficient to confer standing, because under such construction any person would be able to sue in federal court

alleging any official failed to follow the law, even when that person had not alleged other concrete injury. *Id.* at 572, 112 S.Ct. 2130. *Lujan* distinguished the citizen-suit provision of the Endangered Species Act from procedural rights to protect a concrete interest, such as when a plaintiff "living adjacent to the site for proposed construction of a federally licensed dam construction has standing to challenge the licensing agency's failure to prepare an environmental impact statement." *Id.* at 572 n. 7, 112 S.Ct. 2130. However, *Lujan's* footnote seven cites no cases and the fact pattern of the hypothetical dam case is not apparent. In this case, separate types of defendants are alleged to be causing the procedural and environmental injury, the Alli-

## D. Redressability

■ To demonstrate redressability sufficient for standing purposes, a plaintiff must "allege facts from which it could be reasonably inferred that ... if the court affords the relief requested, the asserted [injury] will be removed." *Warth,* 422 U.S. at 504, 95 S.Ct. 2197. The Court finds the Alliance lacks standing to bring its preemption and Due Process claims against the Private Defendants and its Due Process claim against the State Defendants because its requested relief would not redress its alleged injuries. The Alliance requests that the Court issue:

A. Declaratory judgments:

1. Defendants Texas Gulf Wind, Babcock & Brown, and PPM Energy may not build any part of the challenged wind farms in the Texas Coastal Zone before completing environmental review required pursuant to the [Coastal Zone Management Act] and Texas [Program]; and

2. In any proceeding to consider the environmental consequences of the challenged wind farms under the [Act] and Texas [Program], Defendants must allow Plaintiff an opportunity to be heard as an interested and affected party and, as specifically promised by the Texas [Program], the opportunity of judicial review as appropriate;

The Alliance further requests:

B. Permanent and, as may be appropriate, preliminary injunctive relief that, until and unless they undergo proper environmental review under the [Act], with the required public participation including Plaintiff, the proposed wind farms in the Texas Coastal Zone may not be built, in whole or part, by Defendants Texas Gulf Wind/Babcock & Brown or PPM Energy.

■ The Alliances's requested relief does not redress its alleged injuries. Most significantly, the Alliance does not ask the Court to command the State Defendants to conduct consistency review. The Alliance's requested relief therefore does not lead to a reasonable inference that the injury of deprivation of consistency review will be removed, because granting such relief would not direct the State Defendants to do anything to remedy such injury. The relief sought, by prohibiting the Private Defendants from building the wind farms until and unless they undergo consistency review, would temporarily halt environmental harm because construction would halt pending consistency review. But such relief merely penalizes the Private Defendants for State Defendant-caused injury, without requiring the State Defendants to remedy such injury, where there is no allegation that the Private Defendants caused deprivation of consistency review.[16]

Because the Alliance's requested relief would not redress its injuries, the Alliance

ance alleges environmental harm to its members caused by the Private Defendants and deprivation of consistency review by the State Defendants. The Alliance asks *Lujan's* footnote seven to carry more weight here than is warranted, as it is not clear that *Lujan's* language regarding procedural rights supports the Alliance's standing to bring its preemption claim against the State Defendants.

16. The Court notes that if it assumed Coastal Habitat Alliance's standing against the Private Defendants, it would then grant the Private Defendants motion to dismiss for failure to state a claim. *See* Fed.R.Civ.P. 12(b)(6). The Alliance's constitutional claims are not cogni-

zable against private parties. *See Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 358, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) (holding that even heavily regulated private utility is not state actor for purpose of due-process claim); *New Orleans & Gulf Coast Ry. Co. v. Barrois,* 533 F.3d 321, 330 (5th Cir.2008) (holding that preemption claim cannot be asserted against private party). With the Private Defendants dismissed from the case, it becomes even more obvious that the Alliance's requested relief does not redress the injury caused by the State Defendants, as the Alliance's requested relief only affects the Private Defendants.

lacks standing. *See Steel Co.,* 523 U.S. at 109-10, 118 S.Ct. 1003.

### III. Conclusion

Coastal Habitat Alliance lacks standing to bring its claims against Defendants. The Alliance fails to establish standing to bring its preemption claim against the State Defendants because without a private right of action under the Act, the Alliance has not alleged a concrete injury to a legally protected interest. Although the Alliance's procedural Due Process claim against the State Defendants does not suffer from the same flaw, it fails at the redressability prong of the standing test because the Alliance's requested relief would not redress the injury of deprivation of consistency review. The Alliance also fails to establish that its requested relief will redress the injury of environmental harm allegedly caused by the Private Defendants. The Alliance has therefore failed to establish standing to sue the Private Defendants for either of its claims. Because the Alliance's members would not have standing to sue in their own right, the Alliance does not have standing to sue on their behalf. *Hunt,* 432 U.S. at 343, 97 S.Ct. 2434.

**IT IS THEREFORE ORDERED** that PUC Commissioners' Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) and Brief in Support (Clerk's Document 13), Texas Gulf Wind LLC and PPM Energy, Inc.'s Joint Motion to Dismiss and Supporting Brief (Clerk's Document 16), and Commissioner Patterson's Motion to Dismiss Pursuant to Rules 12(b)(1) and 12(b)(6) and Brief in Support (Clerk's Document 23) are **GRANTED.**

**IT IS FURTHER ORDERED** that Coastal Habitat Alliance's claims against

Defendants Jerry Patterson, in his official capacity as Commissioner of the Texas General Land Office; Chairman Barry Smitherman, Julie Carruthers Parsley, and Paul Hudson, in their official capacities as Commissioners of the Texas Public Utility Commission; Texas Gulf Wind, LLC, wholly owned by Babcock & Brown Renewable Holdings, LLC; and Iberdrola Renewables, Inc. are **DISMISSED.**